City of Aurora, Kane County, Illinois, a municipal corporation, Plaintiff-Appellee, v. Warner Bros. Pictures Distributing Corporation, Balaban & Katz Corporation; Publix Great States Theatres, Inc., and William T. Langdon, Defendants-Appellants.

Gen. No. 11,064.

Second District, First Division.

February 11, 1958.

Released for publication February 28, 1958.

Putnam, Johnson & Alschuler, Mayer, Friedlich, Spiess, Tierney, Brown & Platt, and Arthur A. Goldberg (Sam Alschuler, Ralph C. Putnam, Jr., Miles G. Seeley, John E. Clay, and Edward R. Lev, of counsel) for appellants.

Charles A. Darling, Corporation Counsel, for appellee.

JUSTICE McNEAL delivered the opinion of the court.

On January 29, 1957, the Circuit Court of Kane county entered an order for a temporary injunction

restraining the defendants from exhibiting the motion picture "BABY DOLL" in the city of Aurora. On the following day defendants appeared and moved to dissolve the injunction, and plaintiff, city of Aurora, was granted leave to file an amended complaint. On January 31 a hearing was had on defendants' motion to dissolve the original injunction and their written objections to plaintiff's request for a similar temporary injunction on the amended complaint. The original injunction was dissolved, a bond in the sum of $4,000 was required, and another temporary writ ordered as requested. The defendants, Warner Bros. Pictures Distributing Corporation, distributor of the motion picture, Balaban & Katz Corporation and its subsidiary, Publix Great States Theatres, Inc., operators of the Paramount Theatre in Aurora, and William T. Langdon, manager of the theatre, appealed from the order granting the temporary injunction on the amended complaint.

Plaintiff's allegations material on this appeal are: that the city had been empowered by the General Assembly to prohibit the exhibition of obscene or immoral publications, prints, pictures or illustrations (Sec. 23-57, Ch. 24, Ill. Rev. Stat.); that an ordinance in full force and effect in the city of Aurora provided that: "No person shall exhibit, sell or offer to sell or circulate or distribute any indecent or lewd book, picture or other thing whatever of an immoral or scandalous nature, or shall exhibit or perform any indecent, immoral or lewd play or other representation"; that "the motion picture entitled 'BABY DOLL' is scandalous, indecent, immoral, lewd and obscene in that said motion picture displays a scene where the husband attempts to kill his wife's lover, shooting a gun indiscriminately; that said motion picture displays a scene where the young wife is lying on the floor or ground and her lover places his foot on her stomach, moving

276

it about in circular motions and the wife displays an arousal of her sexual passion; that said motion picture displays a scene in a barn where the young wife is in passionate embrace with her lover, and, together with the sound effects of passionate sighing and groaning and the ensuing dialogue, indicate the infidelity of the wife"; that defendants scheduled the picture for exhibition at the Paramount Theatre in Aurora on January 29, 1957, and for several days thereafter; that a large group of the public attended a mass meeting at the City Hall in Aurora, protested the exhibition of the picture, and requested the city officials to stop the exhibition; that it is to the best interest of the public welfare, morals and decency of the public that the court issue the injunction; and that the plaintiff has no adequate remedy at law to prevent the exhibition of the picture.

Affidavits of four persons who stated that they had viewed the picture were attached to the amended complaint. In one affidavit Msgr. F. F. Connor stated:

". . . this motion picture 'BABY DOLL' in substance and manner of presentation seriously offends, denies or ignores traditional standards of morality and decency. It dwells upon suggestiveness in situations and dialogue which make this picture indecent, immoral, lewd and obscene. In two or three situations the star of the show embraced a man, who was not her husband, and gave vent to passionate ejaculations, suggestive of emotional disturbance which the average sophisticated person would associate with marital intercourse. The young actress in the show appears in her nightdress which is abbreviated. She is shown in a semi-nude reclining posture . . . . At this moment her husband is shown in an adjacent room digging a peek-hole through the thin plaster of the dilapidated house, in order to get a look at his young wife, whom he has promised not to 'touch' until she is twenty years

277

of age. This and many other situations are a direct attack upon the sacredness of married life.

". . . one of the leading characters of Sicilian birth, who is referred to as a 'wop' is the owner of a gin mill, the operation of which has affected the business of the young wife's husband. In retaliation the husband commits an act of arson. He is not apprehended. The Italian owner of the gin mill decides to get full justice. In pursuit of this he goes to the home of the young wife, spends a great portion of the day with the young wife, and thus are created the situations of undue familiarity in embracing, passionate kissing, playing games and cavorting about the house and grounds in a manner which is calculated to give the viewer the impression that sooner or later there will be an act of indiscretion and infidelity between the gin mill owner and the young 'untouched' wife."

Mayor Paul Egan stated in his affidavit that ". . . this picture 'BABY DOLL' is an open and flagrant violation of public morals and decency . . . . The miserable portrayal of infidelity of an under-aged wife is most dangerous and revolting. It is harmful to . . . teenage boys and girls who might slip into the show . . . and glorifies seduction and a breakdown of a family home and married life. . . . Another scene showed the Italian and the young wife in an embrace with much fondling by the Italian, and much passionate sighing and groaning by the wife. Another scene shows the Italian with his foot on the stomach of the lightly clad young wife and many movements of a suggestive nature, which was unobjected to by the girl. In a scene where the husband is calling for his friends for help, the wife and the Italian turn out the lights after a most passionate embrace and groans and moans and indications of infidelity are generously shown. . . ."

Attached to defendants' written objections were affidavits of Arthur A. Goldberg, a Vice-president of the Balaban & Katz Corporation, setting forth clippings from Chicago newspapers. From these news items it appears that the picture was designed by playwright Tennessee Williams and director Elia Kazan for adult audiences. One of the principal characters portrayed in "BABY DOLL" is a nubile blond, whose marriage at age 18 to an elderly suitor, Archie, had been arranged by her late daddy with the understanding that the marriage would not be consummated until she was 20. She sleeps in an ornate baby's crib, scantily clad, sucking her thumb. A virile, vindictive young Sicilian suspects that Archie has burned a rival cotton gin. To prove his case of arson, the Sicilian uses sex on Baby Doll, thereby precipitating a tragic crisis and some unnecessarily sexy scenes.

We also read in these newspaper items that eminent clergymen are divided on the merits of the picture. Francis Cardinal Spellman exhorted Roman Catholics not to view the film "under pain of sin," while The Very Rev. James A. Pike, dean of the Protestant Episcopal Church of St. John the Divine, attended the premiere showing in New York. Dean Pike is quoted as having advised persons seeking sex to see "Ten Commandments" instead of "BABY DOLL", saying that BABY DOLL does not match Queen Hefertiti in sensual intent. However, we are not called upon to choose between these widely divergent views or to pass upon the sensual aspects of either picture. Sex and obscenity are not synonymous. Roth v. United States, 354 U. S. 476, 1 L.Ed.2d 1498, 1508.

Defendants contend that the trial court erred in issuing the temporary injunction in this case because the amended complaint fails to show that "BABY DOLL" is obscene and subject to prior restraint without violating defendants' rights of freedom of expres-

279

sion under the first and fourteenth amendments to the Constitution of the United States and section 4, Article II of the Constitution of Illinois.

In American Civil Liberties Union v. Chicago, 3 Ill.2d 334 (1954), plaintiffs alleged that an ordinance of the city of Chicago making it unlawful to exhibit or distribute any motion picture without first having secured a permit from the commissioner of police, deprived plaintiffs of the right of free speech guaranteed by article II, section 4, of the Illinois constitution, and by the first and fourteenth amendments to the United States constitution. The circuit court entered a decree enjoining the city, its mayor and commissioner of police from preventing the exhibition of a motion picture called "The Miracle." The Supreme Court reversed the decree and remanded the cause to determine whether the picture was obscene. After reviewing its decisions and those of the Supreme Court of the United States, our Supreme Court said that in Burstyn v. Wilson, 343 U. S. 495, the court held that the "expression of ideas through motion pictures was protected under the first and fourteenth amendments, observed that this protection did not imply 'absolute freedom to exhibit every motion picture of every kind at all times and all places', . . . and expressly reserved decision on the question 'whether a state may censor motion pictures under a clearly drawn statute designed and applied to prevent the showing of obscene films'." Our Supreme Court further said that "immoral" and "obscene" are synonymous, that a motion picture is obscene if "when considered as a whole, its calculated or dominant effect is substantially to arouse sexual desires, and if the probability of this effect is so great as to outweigh whatever artistic or other merits the film may possess . . . with reference to its effect upon the normal, average person", and that as "thus defined, the term is no broader and

280

no less definite than as used in the postal laws, under which 'prior restraint' has long been exercised through the exclusion of obscene matter from the mails."

In Kingsley Books v. Brown, 354 U. S. 436, 1 L.Ed.2d 1469, 1474 (1957), the United States Supreme Court said that its earlier decision in Near v. Minnesota, 283 U. S. 697, 75 L. Ed. 1357, left no doubt that "Liberty of speech, and of the press, is also not an absolute right," and likewise made it clear that "the protection even as to previous restraint is not absolutely unlimited." In Roth v. United States, 354 U. S. 476, 1 L.Ed.2d 1498, 1507 (1957), the court held that obscenity is not within the area of constitutionally protected speech or press; that obscene material is material which deals with sex in a manner appealing to prurient interest; and that the test is: whether to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest. In Mutual Film Corp. v. Industrial Com., 236 U. S. 230 at p. 242, 59 L. Ed. 552, 559, the court recognized that a prurient interest may be excited and appealed to by motion pictures.

We are unable to detect any artistic or other merit for the normal, average person in a public demonstration of an arousal of sexual passion by means of a foot, or to conceive how this sort of expression comes within the traditional concepts of freedom of speech or of the press. In our opinion the amended complaint made out a prima facie showing that "BABY DOLL" is obscene as defined in the above cases, and the issuance of the temporary injunction did not violate any of defendants' constitutional rights of freedom of expression and against prior restraint.

Defendants also contend that the amended complaint shows on its face that the court lacked jurisdiction of the subject matter because courts of equity in Illinois

281

have no power to act as censors of motion pictures; and that the general powers of equity do not include the power to enjoin acts which are merely criminal or immoral, and unconnected with any threatened invasion of property rights. In Stead v. Fortner, 255 Ill. 468, cited by defendants, the court sustained an injunction issued at the suit of the Attorney General and the State's Attorney, enjoining the use of a building for the sale of liquor in Shelbyville, then anti-saloon territory. The court held that a court of equity has jurisdiction to abate a public nuisance even though the offenders are amenable to the criminal law and no property rights are involved. At page 477 the court said: "This court has never regarded a criminal prosecution, which can only dispose of an existing nuisance and cannot prevent a renewal of the nuisance, for which a new prosecution must be brought, as a complete and adequate remedy for a wrong inflicted upon the public. The public authorities have a right to institute the suit where the public welfare demands it and damages to the public are not susceptible of computation. The maintenance of the public health, morals, safety and welfare is on a plane above mere pecuniary damage although not susceptible of measurement in money, and to say that a court of equity may not enjoin a public nuisance because property rights are not involved, would be to say that a state is unable to enforce the law or protect its citizens from public wrongs. . . . There are a number of States where jurisdiction is expressly conferred upon courts of equity, but a statute is not necessary to enable such courts to exercise a jurisdiction of ancient origin and which has always existed without any statute."

In People v. Clark, 268 Ill. 156, the court followed its decision in Stead v. Fortner, and sustained an injunction restraining Nellie Clark and others from using certain premises for the practice of prostitution.

282

She contended that a court of equity has no jurisdiction to punish crime, and the Court said, ". . . that is true if punishment of crime is the only object of the proceeding; but the rule is that where a nuisance affects the public welfare it may be abated in equity on the application of the proper officer . . . . The jurisdiction of courts of equity to enjoin nuisances is ancient and in cases of public nuisances is coincident with the remedy by indictment. The remedy by injunction is based on the ground that courts of equity have ability to give a more complete remedy, operating through future time, than is obtainable by law, and it is a well recognized branch of equity jurisprudence to restrain public nuisances by injunction."

City of Sterling v. Speroni, 336 Ill. App. 556, involved an injunction enjoining the operation of a bookie joint in the basement of the Galt Hotel in Sterling. On appeal it was contended that equity will not interfere with matters which are simply criminal or immoral unless the operation of such a place interferes with property rights. This court sustained the injunction and said: "The only effective means of abating a nuisance of the character of the one shown by the evidence found in this record and to silence this bookie joint is by the strong and far reaching use of the equitable powers of the trial court."

Burden v. Hoover, 7 Ill.App.2d 296, was an action filed individually by licensed chiropractors to enjoin unlicensed chiropractors from practicing their profession. The trial court sustained a motion to dismiss the action. The Appellate Court, Third District, affirmed the dismissal, said that it has been established in this State that courts of chancery have no jurisdiction to interfere at the suit of a private person merely for the prevention of crimes or statutory offenses, that the scope of equity jurisdiction is to enforce or protect civil or property rights, and concluded that the prac-

tice of chiropractic is not a public nuisance per se or by statute, following the decision in People v. Universal Chiropractors' Ass'n, 302 Ill. 228. This decision is cited and relied upon by defendants here. However, in Burden v. Hoover, 9 Ill.2d 114, the Supreme Court overruled its decision in 302 Ill. 228, reversed the Appellate Court and remanded the cause with directions to deny the motion to dismiss the complaint. The Supreme Court said that courts are abandoning the strict view that formerly prevailed in this area; that the prevention of unlicensed practice of chiropractic benefits the public by helping to insure compliance with laws which have been sustained as a reasonable exercise of the police power in protecting the public health and welfare; and that the legislature could have provided for injunctive relief, but its failure to do so does not preclude a court from acting.

 In our opinion courts of equity in Illinois have power to enjoin criminal or immoral acts even though the offenders are amenable to prosecution and no property rights are involved, in order to protect citizens from public wrongs and to protect the public health and welfare. Here the trial court did not act as a censor of motion pictures generally or determine as a matter of fact that "BABY DOLL" is obscene. The court did restrain temporarily the exhibition of a film which according to the amended complaint, is prima facie immoral and obscene.

 The primary purpose of a temporary injunction is to preserve matters in status quo until the court has had an opportunity to consider the case on its merits, and the showing on the pleading to obtain a temporary writ is less than that required to obtain a final and permanent injunction. Accordingly the city of Aurora was not required to make out a case which would, in all events, warrant relief at the final hearing. Plaintiff was required only to show prima facie

284

a fair question as to the existence of the injunctive relief claimed and circumstances leading to a belief that plaintiff probably would be entitled to relief, if the proof sustained the allegations, and to satisfy the court that matters should be preserved in status quo until the case could be disposed of on its merits. O'Brien v. Matual, 14 Ill.App.2d 173, 186.

The law is well settled in Illinois that the trial court is vested with large discretionary power in granting an order for a temporary injunction and unless the reviewing court finds that the discretion has been abused the order will not be set aside. Arends v. Naughton, 11 Ill.App.2d 227, 236; Bernard Bros., Inc. v. Deibler, 326 Ill. App. 538, 542. Especially is this true where the temporary injunction issued after notice and a hearing and upon the giving of bond. Shatz v. Paul, 7 Ill.App.2d 223, 235. We find no abuse of discretion here, and conclude that the trial court had jurisdiction in this case and acted properly in ordering the temporary injunction to issue. Therefore the judgment of the Circuit Court of Kane county is affirmed.

Affirmed.

DOVE, P. J. and SPIVEY, J., concur.