STEVEN TOUSHIN et al., d/b/a STRATFORD-ON-AVON, Plaintiffs-Appellants,
v. THE CITY OF CHICAGO et al., Defendants-Appellees.

(No. 59707;

First District (3rd Division)—October 17, 1974.

798

Patrick A. Tuite and Angelo Ruggiero, both of Chicago, for appellants.

Richard L. Curry, Corporation Counsel, of Chicago (William R. Quinlan and Jerome A. Siegan, both Assistant Corporation Counsel, of counsel), for appellees.

Mr. JUSTICE DEMPSEY delivered the opinion of the court:

This is an interlocutory appeal by the plaintiffs, Steven Toushin and Jerry Krule, from an order which (a) denied their motion for a temporary injunction restraining the City of Chicago and its superintendent of police from interfering with the operation of their business, and (b) granted the City's motion for an order forbidding them from conducting their business within the City's limits.

Toushin and Krule, on July 3, 1973, opened an establishment known as Stratford-on-Avon at 4411 North Broadway in the City of Chicago. On July 5, and each of several days following, City police arrested the manager and employees of Stratford and charged them and the plaintiffs with operating a massage parlor without a license and with permitting female employees to massage male patrons, all in violation of chapter 152 of the Municipal Code of Chicago. The plaintiffs responded on July 16 by filing this action. Their complaint alleged irreparable harm from the repeated raids and sought a declaration of the unconstitutionality of chapter 152, as well as temporary and permanent injunctions.

The asserted bases of the ordinance's infirmity were: that the State has not expressly delegated to municipalities the power to regulate massage parlors; that the City's ordinance was vague and lacked standards and guidelines necessary to prevent arbitrary administration; that its prohibition against massages by members of the opposite sex discriminated on the basis of sex in violation of the Illinois Constitution, article I, section 18. The plaintiffs further contended that they did not need a license to operate under a void ordinance and that even if the enactment was valid it did not apply to their particular business, which they styled a "sensitivity center" and a private club.

The City answered and counterclaimed, seeking temporary and permanent injunctions against the operation of Stratford. Its position was that ample authority justified enactment of the ordinance under the police powers derived from its charter and several statutes; that the law was reasonably related to the ends to be served—protecting the public health and welfare and community morals; that this applied with special force to the requirement that females not administer massages to male patrons. The counterclaim characterized Stratford as a masturbatory-massage parlor, in which the massages administered were for the purpose

of sexual arousal and the gratification of clients, and allege that irreparable harm and a multiplicity of litigation would result from the continued operation of the business. It was alleged that the plaintiffs' attempt to distinguish Stratford from massage parlors regulable under chapter 152 because it was a private club and sensitivity center had no substance, since "membership" was available to anyone willing to pay a $5 fee; that the purported restrictions on immoral behavior included in the membership agreement were not enforced and the only service actually provided was the sexually oriented massage.

At the hearing on the motions, only one witness appeared for each side. Michael Lescher, Stratford's assistant manager, described the physical layout of the establishment, the conditions of membership, and the extent to which employees were supervised. The premises consisted of a reception room, a recreation or waiting room containing refreshments and a pool table, a locker and shower area, and nine 6' x 7' cubicles in which massages were given. These rooms were semi-private, with doorways covered by curtains.

Potential customers were first required to join the club which, admittedly, had neither officers nor directors. Life membership was available at a cost of $5 and was conditioned on the applicant's signing an agreement that he would not request, offer or agree to perform any act of prostitution with any of Stratford's employees, and declaring that he was at least 18 years of age and was not working for any law-enforcement agency. Stratford's female employees numbered approximately 15. They too were required to sign an undertaking; by it they agreed not to perform acts of prostitution with members, under threat of dismissal. Their attire was left to their own taste, subject to the requirement that some form of pants and top be worn.

Lescher testified that the club's purpose was to provide a place of relaxation for its members. As he described it, a member typically would enter the recreation room, where several female employees would be waiting. From the recreation room the member would proceed to one of the booths, where he would receive a "sensitivity rub" from one or more employees. Fees for the rubs began at $20 for a half-hour massage by a single employee and progressed upward to $100, varying in price according to the duration of the rub and the number of participating masseuses. Such skills as these employees possessed were imparted to them in occasional sessions of instruction by a licensed masseur, whom Lescher remembered only by the name of Tony. Supervision of the operation consisted of periodic walks past the massage booths by the manager on duty, who would not observe the activities, but instead listened to "see if we can hear if anything is going on beyond what's

allowed." Notwithstanding the six raids by police during the times Lescher was on duty, and the arrest each time of several employees on charges which included prostitution, he maintained that to his knowledge there had been no violations of the rules against such acts and that no employees had been dismissed for such a reason. But there was no rule against the fondling of a customer's genitals in the course of a massage, since that was believed to be activity outside the scope of the prohibitions of the law against prostitution. Ill. Rev. Stat. 1971, ch. 38, par. 11—14.

Andrew Murcia, an officer in the Vice Control Division of the Chicago Police Department, testified that on July 5, 1973, he registered as a member. At the time he was handed a paper listing the rules of behavior, but they were not explained. Once admitted, he was told that it would cost him $20 for a half-hour. The receptionist then conducted him to the recreation room, which was occupied by several young women in flimsy pajamas and transparent costumes. One of them greeted him and led him to one of the massage booths, where she told him to remove all his clothing and climb onto a table. He did as she instructed; for a short while, as he lay on his stomach, she massaged his back, legs, neck and shoulders with a lotion. She then told him to turn over. When he had done so, she said he could fondle her breasts, which she had bared, and then began to fondle his penis. When told not to continue, she replied, "Well, how else can I make you come?" They then were interrupted by the appearance of arresting officers. While they dressed, the girl, still unaware that Murcia was a policeman, took $10 payment in return for her promise that the next time he came she would permit him to perform an act of cunnilingus.

■■ The purpose of a temporary injunction is to prevent a threatened wrong or further perpetration of an injury pending a full hearing on the merits of the case. (*H.K.H. Development Corp. v. Metropolitan Sanitary District* (1964), 47 Ill.App.2d 46, 196 N.E.2d 494.) In order to obtain the writ a party is not required to make out a case which will in all events warrant relief at the final hearing. (*Aurora v. Warner Bros. Pictures Distributing Corp.* (1958), 16 Ill.App.2d 273, 147 N.E.2d 694.) It is only necessary for the petitioning party to raise a fair question as to the existence of the right claimed, lead the court to believe that he probably will be entitled to the relief prayed for if the proof should sustain his allegations, and make it appear advisable that the positions of the parties should stay as they are until the court has the opportunity to consider the case on the merits. (*Frederick Chusid & Co. v. Collins Tuttle & Co.* (1973), 10 Ill.App.3d 818, 295 N.E.2d 74.) The motion is addressed to the sound discretion of the trial court; its determination

ordinarily follows an attenuated offer of evidence and argument as to controlling principles of law. Accordingly, the role of an appellate court when reviewing the grant or denial of an interlocutory decree is restricted solely to a determination whether the judge correctly exercised his broad discretionary power. *Frederick Chusid & Co. v. Collins Tuttle & Co.*

In support of their appeal, the plaintiffs have renewed and amplified the arguments presented to the trial court. They assert the following: (1) the underlying ordinance is void because it exceeds the City's powers under its charter and because it lacks standards or guidelines and thus leaves arbitrary enforcement powers in the hands of City officials; (2) the ordinance is further void because it denies equal protection and due process of the law by segregating the sexes; (3) the court's finding that plaintiffs' business was a public nuisance was unjustified by the evidence and the court could not enjoin the activity solely because it involved what the court believed to be the commission of a crime; and (4) the court's formulation of the decree exceeded the proper scope of a temporary injunction, altering rather than preserving the status quo, and in fact decided the case on the merits, thus depriving the plaintiffs of a trial. They seek reversal and remandment for reconsideration of the denial of their own motion, of the order granting the temporary writ requested by the City, and of the court's preliminary finding as to the constitutionality of chapter 152.

We must first stress that the substantive issues are not before us for resolution. They were not finally decided by the trial court and we will not decide them now. (*Frederick Chusid & Co. v. Collins Tuttle & Co.*) Rather, each will be examined only so far as is necessary to our inquiry as to whether the court acted within the bounds of proper discretion.

■■■ Concerning the challenges to the validity of chapter 152, the City cited to the trial court a number of provisions in the Cities and Villages Act delegating powers to municipalities to pass and enforce all necessary police ordinances, to suppress bawdy or disorderly houses and houses of assignation, to prevent prostitution, and to make all regulations necessary or expedient for the promotion of health or suppression of diseases. (Ill. Rev. Stat. 1971, ch. 24, pars. 11—1—1, 11—5—1, 11—5—4, 11—20—5.) Individually or collectively they could be construed to support an implied delegation to the City of powers to license and control massage parlors. Moreover, the courts have enforced chapter 152 over its long history. (See *People ex rel. Anderson v. City of Chicago* (1941), 312 Ill.App. 187, 37 N.E.2d 929 [abstract opinion].) This, plus the general rule that ordinances and regulations adopted under the

police power are presumed valid and will not be disturbed unless shown to be palpably arbitrary or unfair (see *Schuringa v. City of Chicago* (1964), 30 Ill.2d 504, 198 N.E.2d 326, *cert. denied*, 379 U.S. 964), support the court's decision. It was well within the court's discretionary power, relying on these commonly held principles, to enter its preliminary finding upholding the validity of chapter 152, pending a more complete consideration of the law at the final hearing. The fact that the plaintiffs also raised issues of due process and equal protection in their attack on the so-called segregation of sexes does not alter this conclusion. While the equal protection issue is a serious one (see *Cianciolo v. Members of City Council* (E.D. Tenn. 1974), 376 F.Supp. 719), normally an attack on the constitutionality of a statute should not be resolved upon application for a temporary injunction. (*LeBaron v. Los Angeles Building & Construction Trade Council* (S.D. Cal. 1949), 84 F.Supp. 629, *aff'd* (9th Cir. 1950), 185 F.2d 405; 16 C.J.S. *Constitutional Law*, § 95, at 329 (1956).) The delay entailed by this deliberate approach works no harm on Stratford's owners. Even if the ordinance had been voided as unconstitutional, Stratford was still subject to the court's equitable powers to declare it a public nuisance and enjoin its operation on that ground. *Cianciolo v. Members of City Council.*

The court's memorandum included preliminary findings that the operation of the plaintiffs' unlicensed business in continuous and open violation of chapter 152 was a public nuisance, and that the circumstances justified issuance of an injunction against the commission of a crime. The plaintiffs argue that there was no showing to support the conclusion that a public nuisance existed, and that the court had no authority in equity to enjoin the commission of a crime.

■■ As a general rule, equity will not enjoin criminal and quasi-criminal acts. This proceeds from a recognition that the legislature by invoking the criminal sanction has expressed a preference for the form which punishment should take. It is also grounded in the fear that rights guaranteed to criminal defendants may be circumvented by proceeding against such persons through a juryless civil action. However, exception is made to the general rule "* * * when the act complained of constitutes a menace to the public health, safety or welfare, and where the enforcement of the criminal law is merely incidental to the general relief sought." (*City of Chicago v. Larson* (1961), 31 Ill.App.2d 450, 454, 176 N.E.2d 675.) Equity looks to substance and not to form. If the underlying purpose of an unjunctive order is to prevent interference with the City's obligation to protect its citizens, the court's hands will not be bound merely because the activity sought to be restrained also con-

stitutes a criminal offense. *Aurora v. Warner Bros. Pictures Dist. Corp.* (1958); *City of Chicago v. Larson.*

The court's summation made clear that the question of criminality was not uppermost:

> "* * * [A]t a minimum what is being conducted here is a massage parlor which is not duly licensed under Chapter 152 of the Municipal Code of Chicago. What appears to be in operation here beyond that is the conduct of something that may or may not be short of a house of prostitution. Whether it is or it is not, it is clear that this type of activity has a deleterious effect upon the morals and welfare of the community."

Indeed, the available evidence tended to show that the plaintiffs' objective from the first was to pursue activities which bordered on illegality without quite crossing into it. To avoid licensing and regulation under chapter 152, the business was termed a private club while massages became sensitivity rubs; the supposed loophole in the laws against prostitution was relied upon to support the legality of what was nevertheless blatantly sexual massage. Precisely because the criminality of the plaintiff's operation was uncertain, we believe the public nuisance doctrines of *Warner* and *Larson* are especially apt in this case. The court's finding that Stratford was a public nuisance amenable to restraint constituted no abuse of discretion.

But the discretion to restrain the operation of nuisances is not an unfettered one. The injunction must be reasonable and should go no further than is essential to safeguard the rights of the petitioner. (*Kessie v. Talcott* (1940), 305 Ill.App. 627, 27 N.E.2d 857.) The interlocutory decree awarded the City was of such scope that far from preserving the issues of the case it had the effect of finally deciding them. The decree, which restrained the plaintiffs from "operating their business at 4411 North Broadway, Chicago, Illinois, or at any other location within the City of Chicago * * *" was overbroad and the cause must be remanded for its modification.

■■ When criminal offenses are carried on in a manner which makes the place of their occurrence a nuisance, equity will intervene to order abatement of the nuisance, but the decree runs only against the nuisance, not the illegal or immoral practices themselves. It is the place of the nuisance which is enjoined. (*People ex rel. Barrett v. Fritz* (1942), 316 Ill.App. 217, 45 N.E.2d 48.) A statutory exception exists under the act governing public nuisances (Ill. Rev. Stat. 1971, ch. 100½, par. 1 *et seq.*), which provides for county-wide injunctions against the operation of houses of prostitution. However, this cause was not brought under that

statute. The effect of this decree was to enjoin hypothetical prospective nuisances at other places. By doing so it failed to recognize that the sources of classification as a nuisance might be abated, and thus it exceeded its proper scope.

The plaintiffs suggest that the status quo would better have been preserved by an order prohibiting the police from interfering with their operation pending a disposition at the final hearing. As the City points out, to grant such relief would be tantamount to immunization of the business against the need to observe the law, and would be at least as conclusive of rights as the order which was actually granted. *Cf. Klein's Restaurant Corporation v. McLain* (1937), 293 Ill.App. 54, 11 N.E.2d 644.

The order of the court is affirmed, but the cause is remanded for reformulation of the decree in a manner not inconsistent with this opinion.

Affirmed and remanded.

McNAMARA, P. J., and McGLOON, J., concur.