THE PEOPLE *ex rel.* THOMAS J. DIFANIS, State's Attorney for Champaign County, Plaintiff-Appellee, *v.* REX BOSTON (Impleaded), Defendant-Appellant.

Fourth District    No. 16405

Opinion filed January 23, 1981.—Rehearing denied February 27, 1981.

CRAVEN, J., dissenting.

Robert J. Waaler, of Champaign, for appellant.

Thomas J. Difanis, State's Attorney, of Urbana (Patricia A. Crowley, Assistant State's Attorney, of counsel), for appellee.

Mr. JUSTICE GREEN delivered the opinion of the court:

This case concerns a proceeding brought on the relation of the State's Attorney of Champaign County against defendant, Rex Boston, pursuant to the provisions of "An Act regarding places used for purposes of lewdness, assignation, or prostitution, to declare the same to be public nuisances, and to provide for the more effectual suppression thereof" (Ill. Rev. Stat. 1977, ch. 100½, par. 1 *et seq.*). Defendant appeals from an order of the circuit court of Champaign County entered on April 3, 1980, enjoining him from (1) maintaining a nuisance, specifically, a place of prostitution at 612 North Walnut St., Champaign, where a place of business known as "The Spot" was located, (2) using the above property for any purpose for one year, and (3) maintaining or permitting prostitution on any premises within his control in the State of Illinois. He asserts that the court erred in (1) denying his *in limine* motion requesting suppression of certain evidence, (2) failing to appoint a special prosecutor, (3) ordering an injunction when legal remedies would have been adequate, and (4) enjoining too broad a scope of defendant's activities.

The heart of the case concerns the ruling denying defendant's motion *in limine*. It asked for an order prohibiting plaintiff, his agents, and his witnesses from testifying or referring to any illegal activities engaged in

by plaintiff, his agents and his recruits. A showing was made at the hearing that in the course of an investigation, the State's Attorney or members of the police department of the City of Champaign had recruited three males to patronize prostitutes on the premises of "The Spot." Two recruits subsequently engaged in sexual intercourse with female employees of "The Spot" on three or four occasions and with one encounter by one employee including the performance upon him of an act of fellatio by the female. The third recruit employed a female employee to perform a masturbatory massage and fellatio upon him on one occasion. The money used to obtain the service of these females was furnished by the aforesaid law enforcement agencies.

Defendant maintains that the conduct of the State's Attorney in recruiting and directing the agents actually to engage in the described illicit acts with his employees was so outrageous as to constitute a violation of his fundamental right to due process. This argument appears to be novel in this State in two respects: First, we have not found any Illinois cases recognizing a valid defense wherein due process is violated by outrageous governmental conduct not violative of any other specific constitutionally guaranteed right; second, in cases from other jurisdictions where the defense was explicitly or implicitly recognized, the remedy indicated was not the exclusion of evidence so obtained but the barring of the action.

Defendant acknowledges that the defense of entrapment is not available to him in the present case and asserts that he is not urging the defense of entrapment. Rather, defendant argues that in *Hampton v. United States* (1976), 425 U.S. 484, 48 L. Ed. 2d 113, 96 S. Ct. 1646, although the majority of justices rejected the "objective (governmental conduct) test" of entrapment while reaffirming the "subjective (predisposition) test" as the only valid test of entrapment, five justices failed to foreclose the possibility of a fundamental fairness defense. Three years earlier a Supreme Court majority opinion first acknowledged the potential validity of a fundamental fairness defense.

In *United States v. Russell* (1973), 411 U.S. 423, 36 L. Ed. 2d 366, 93 S. Ct. 1637, the court, while reaffirming the principle that the entrapment defense "focus[es] on the intent or predisposition of the defendant to commit the crime" (411 U.S. 423, 429, 36 L. Ed. 2d 366, 371, 93 S. Ct. 1637, 1641), distinguished this nonconstitutional defense of entrapment from the constitutional due process defense theory based on outrageous governmental conduct. (411 U.S. 423, 427-28, 432-33, 36 L. Ed. 2d 366, 371, 374, 93 S. Ct. 1637, 1640-41, 1643.) The court concluded in *Russell* by acknowledging the potential validity of the due process theory, stating:

> "While we may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due

process principles would absolutely bar the government from invoking judicial processes to obtain a conviction, cf. *Rochin v. California*, 342 U.S. 165 (1952), the instant case is distinctly not of that breed * * *. The law enforcement conduct here stops far short of violating that 'fundamental fairness, shocking to the universal sense of justice,' mandated by the Due Process Clause of the Fifth Amendment." 411 U.S. 423, 431-32, 36 L. Ed. 2d 366, 373, 93 S. Ct. 1637, 1643.

In *Hampton*, the defendant relied on the quoted language from *Russell*, acknowledging his case did not present a basis for the entrapment defense. The plurality opinion rejected defendant's argument saying:

"The limitations of the Due Process Clause of the Fifth Amendment comes into play only when the Government activity in .question violates some protected right of the *defendant*." (425 U.S. 484, 490, 48 L. Ed. 2d 113, 119, 96 S. Ct. 1646, 1650.)

Two justices, however, concurred in the result but were "unwilling to conclude that an analysis other than one limited to predisposition would never be appropriate under due process principles." (425 U.S. 484, 493, 48 L. Ed. 2d 113, 121, 96 S. Ct. 1646, 1651-52.) Justice Powell's concurrence stated:

"[T]he cases, if any, in which proof of predisposition is not dispositive will be rare. Police overinvolvement in crime would have to reach a demonstrable level of outrageousness before it would bar conviction. This would be especially difficult to show with respect to contraband offenses, which are so difficult to detect in the absence of undercover Government involvement. One cannot easily exaggerate the problems confronted by law enforcement authorities and dealing effectively with an expanding narcotics traffic, * * *. Enforcement officials therefore must be allowed flexibility adequate to counter effectively such criminal activity." 425 U.S. 484, 495-96 n.7, 48 L. Ed. 2d 113, 122 n.7, 96 S. Ct. 1646, 1653 n.7.

The three dissenting justices in *Hampton* felt that the defense of entrapment itself should encompass improper use of governmental power notwithstanding predisposition. But the dissent also expressed the view that *Russell* did not foreclose a bar to conviction based on due process principles "where the conduct of law enforcement authorities is sufficiently offensive * * *." 425 U.S. 484, 497, 48 L. Ed. 2d 113, 123, 96 S. Ct. 1646, 1653-54.

The due process defense of outrageous police conduct was elevated from theory to reality in *United States v. Twigg* (3d Cir. 1978), 588 F.2d 373. That court reversed convictions of two defendants because "the

nature and extent of police involvement * * * was so overreaching as to bar prosecution of the defendants as a matter of due process of law." 588 F.2d 373, 377.

In *Twigg*, a government informer suggested the establishment of a laboratory to manufacture "speed" to defendant Neville. Neville undertook the primary responsibility for raising capital and arranging for distribution of the drug, while a government agent undertook the acquisition of necessary equipment, raw materials, including an essential chemical which was the most difficult to obtain, and a production site. Defendant Twigg then entered the operation, apparently to repay a debt to defendant Neville. Twigg accompanied the government agent on several trips to get chemicals under arrangements made by the Drug Enforcement Agency. The government agent was completely in charge of the laboratory. Neville was arrested when leaving the laboratory with some of the "speed." Twigg was arrested at the lab. The court reversed convictions of both defendants because the governmental intervention in the criminal activities of the case reached " 'a demonstrable level of outrageousness.' " 588 F.2d 373, 380.

In a footnote, the *Twigg* court stated:

> "We are adhering to Justice Powell's reasoning [in *Hampton*] that in evaluating whether government conduct is outrageous, the court must consider the nature of the crime and the tools available to law enforcement agencies to combat it." (588 F.2d 373, 378 n.6.)

Notwithstanding these facts and the analysis, one judge dissented, not because the due process defense would not sometimes be valid, but because he did "not believe this situation presents the intolerable set of facts necessary to warrant resort to the due process clause * * *." 588 F.2d 373, 383.

Since *Twigg*, other cases have acknowledged the validity of the due process defense. See, *e.g., United States v. Bocra* (3d Cir. 1980), 623 F.2d 281; *United States v. Nunez-Rios* (2d Cir. 1980), 622 F.2d 1093. See also *People v. Isaacson* (1978), 44 N.Y.2d 511, 406 N.Y.S.2d 714, 378 N.E.2d 78.

The State has argued that this due process defense is merely the "objective" entrapment theory under another name and that our supreme court has conclusively rejected this theory in *People v. Cross* (1979), 77 Ill. 2d 396, 396 N.E.2d 812. We believe that the distinction between the entrapment and due process defenses as recognized by the United States Supreme Court in *United States v. Russell* is valid and that *Cross* should not be interpreted as a bar to the due process defense.

■■ The instant proceeding is not a criminal prosecution but one in equity for injunctive relief. Regardless of the type of proceedings, however, we do not consider the conduct of the government in this case to have reached the "demonstrable level of outrageousness" which would justify

either a bar to the action or exclusion of the evidence obtained as a result of the governmental conduct in question. In *City of Chicago v. Cecola* (1979), 75 Ill. 2d 423, 389 N.E.2d 526, *City of Chicago v. Geraci* (1975), 30 Ill. App. 3d 699, 332 N.E.2d 487, and *Toushin v. City of Chicago* (1974), 23 Ill. App. 3d 797, 320 N.E.2d 202, trial court orders granting injunctive relief were upheld in the face of similar conduct by police investigators which, although not raised as an issue, was recited in the opinions.

The theory of the outrageousness defense focuses upon the government's conduct rather than upon the defendant's predisposition. (*Russell.*) Here, unlike in *Twigg*, the law enforcement officers did not concoct the scheme whereby the unlawful acts were performed. While the evil sought to be prevented was not as serious as that of trafficking in narcotics, we cannot say with certainty that consummation of the sex act by the investigators was unnecessary to obtain the desired evidence. We also note that the *Hampton* plurality deemed the essence of the due process defense of outrageousness to be the violation of a "protected right of the *defendant*." The concurring opinion did not refute this assertion but only refuted the plurality's conclusion that a defendant's predisposition to commit the offense always precluded the outrageousness defense. No contention is made here that an intrusion was made upon defendant's rights. Rather, the contention of the defendant concerns the propriety of the example set by the governmental conduct. We hold that ground to have been insufficient under the circumstances to have required the granting of the motion *in limine* or the later exclusion of the evidence.

■■ Defendant's next contention is that a special prosecutor should have been appointed below pursuant to section 6 of "An Act in regard to attorneys general and state's attorneys." (Ill. Rev. Stat. 1979, ch. 14, par. 6.) The propriety of appointing a special prosecutor was not raised by defendant until after trial on the merits was had and the judgment order and order of abatement were entered. At that time, defendant filed a motion to vacate in which he contended a special prosecutor should have been appointed. Although we see nothing in the issues presented which would deter the State's Attorney from unimpeded prosecution of the case before us, we need not rule directly upon defendant's contention because the issue was waived by defendant's failure to raise it timely. See *In re Petition of McNulty* (1978), 60 Ill. App. 3d 701, 377 N.E.2d 191.

■■ Defendant's argument that injunction was an inappropriate remedy is without merit. In *Cecola* the supreme court rejected the argument, holding that the remedy of a criminal proceeding was inadequate there where the operator of the massage parlor furnishing masturbatory massages would only be subject to a fine. That court noted further that a common law remedy of injunction to abate the keeping of a house of prostitution existed. Furthermore, unlike in cases cited by defendant, the

instant action was brought pursuant to legislation specifically authorizing injunctive relief to abate the use of buildings for "lewdness, assignation, or prostitution" (Ill. Rev. Stat. 1979, ch. 100½, par. 1). Although prostitution is prohibited by section 11—14 of the Criminal Code of 1961 (Ill. Rev. Stat. 1979, ch. 38, par. 11—14), section 1—4 of the Code (Ill. Rev. Stat. 1979, ch. 38, par. 1—4) provides that the Code does not "bar * * * any * * * other remedy authorized by law to be * * * enforced in a civil action" for conduct punishable by the Code.

■■ Finally, defendant urges that the court below did not have jurisdiction to enjoin defendant's activities statewide. The writ of permanent injunction included a perpetual restraint on defendant from maintaining or permitting prostitution on any premises within his control within the State of Illinois. Defendant contends the court had jurisdiction to enjoin his activities only in Champaign County. The legislation under which the action was brought authorized the court to "perpetually" restrain one maintaining a nuisance from "maintaining any such nuisance *within the jurisdiction of the court*." (Emphasis added.) (Ill. Rev. Stat. 1979, ch. 100½, par. 5.) Circuit courts have power to award "throughout the state * * * writs of injunction * * * that may be necessary to the due execution of the powers with which they are or may be vested" (Ill. Rev. Stat. 1979, ch. 37, par. 72.26). The scope of the injunction was not beyond the power of the court.

For the reasons stated, we affirm.

Affirmed.

WEBBER, J., concurs.

Mr. JUSTICE CRAVEN, dissenting:
Without delving too deeply into the debate between deontological and teleological ethics or the relationship between morality and positive law, I dissent from the majority's decision. My remarks are directed at the disposition of the defendant's first claim of error, concerning the government's conduct in its investigation of the nightclub.

The defendant has correctly acknowledged that entrapment is not at issue here and argues instead that the government's participation in the acts of prostitution reached such a level of outrageousness that he has been denied due process.

As the State sought and obtained an injunction, the questions in this case are governed by equitable principles. A party seeking equitable relief must come into court with clean hands; the government's participation in illegal activities has tainted its position. Accepting the State's

evidence as true, the three recruits, who were instructed to obtain evidence of prostitution at The Spot by engaging in sexual activity with employees, were guilty of patronizing prostitutes (Ill. Rev. Stat. 1979, ch. 38, par. 11—18). By knowingly directing the recruits to The Spot for that purpose, the persons in charge of the investigation were guilty of soliciting prostitution (Ill. Rev. Stat. 1979, ch. 38, par. 11—15) and official misconduct (Ill. Rev. Stat. 1979, ch. 38, par. 33—3(b)). The unclean hands principle is as applicable to the government as it is to private parties. *Olmstead v. United States* (1928), 277 U.S. 438, 484, 72 L. Ed. 944, 959, 48 S. Ct. 564, 574 (Brandeis, J., dissenting).

No statutory authorization exists to absolve the government and its agents of this misconduct. Unlike the Department of Law Enforcement, which is authorized by statute to purchase controlled substances and cannabis in gathering evidence of drug use (Ill. Rev. Stat. 1979, ch. 127, par. 55a(15), 55j), the State's attorney and the local police departments can point to no similar provision permitting the type of investigatory activity used in this case. The existence of the statute permitting drug purchases may reflect the judgments that drugs present a greater danger to society than other forms of criminality or that drug trafficking is too difficult to detect without the use of undercover purchases. Neither reason applies to prostitution, however.

The State could have obtained its evidence without directing its agents to have sex with the alleged prostitutes. The normal course of feigning interest and stopping short of sex yields evidence sufficient to enjoin the nuisance or to convict. *City of Chicago v. Cecola* (1979), 75 Ill. 2d 423, 389 N.E.2d 526; *City of Chicago v. Geraci* (1975), 30 Ill. App. 3d 699, 332 N.E.2d 487.

The question posed by the evidence and tactics in this case is whether the nature of the nuisance excuses the investigatory methods used, or more simply, whether the end justifies the means. We must keep in mind what this case does not involve: National security was not in danger of being breached; lives were not threatened; the future of western civilization was not at stake. Those dangers are the usual excuses for order and safety at any cost, but the goal here was neither so important nor so worthy. The principles of equity should not be treated cavalierly; nothing in this case convinces me that the government's misconduct should be ignored or overlooked or excused. The State comes into court with unclean hands and the requested relief should have been denied. I would exclude the evidence when the taint is slight and bar the action when the taint pervades the entire suit, as it does here.

The antecedents for my argument are found in earlier cases and more specifically in earlier dissents. Participation by the government in illegal

activities is not new; the reasons against countenancing it in a court are still valid today. Refusing to permit the government to use criminal means for gathering evidence helps to maintain respect for the law, engenders public trust in the judicial system, and keeps the courts untainted. (*Olmstead*, 277 U.S. 438, 484, 72 L. Ed. 944, 959, 48 S. Ct. 564, 574-75 (Brandeis, J., dissenting).) In *Casey v. United States* (1928), 276 U.S. 413, 72 L. Ed. 632, 48 S. Ct. 373, where the government had instigated the crime for which the defendant was being prosecuted, Brandeis said, again in dissent:

> "This prosecution should be stopped, not because some right of Casey's has been denied, but in order to protect the government. To protect it from illegal conduct of its officers. To preserve the purity of its courts." (276 U.S. 413, 425, 72 L. Ed. 632, 637, 48 S. Ct. 373, 376.)

Permitting the State to bring actions based on evidence obtained through criminal acts ultimately demeans the judicial system. The courts become partners in the illegality. The immediate result may appear innocuous but the infection remains; in the long run illegal and evil means will attenuate the principle that we are governed by laws rather than persons. It is true that in the long run we are all dead, yet future generations will have to live with the precedents we create. I am afraid that bad law, like bad money, drives out good. I foresee a decline in the public's trust in its judicial system, for by approving illegal police tactics we invite disrespect and cynicism:

> "A nation devoted to the proposition of equality under law and the sanctity of individual freedom should not permit the government it has entrusted with the task of protecting those principles to flout them in the name of 'law enforcement.' The laws being enforced are meaningless if those bound to enforce them place themselves above the law." (Cohn, *The Need for an Objective Approach to Prosecutorial Misconduct*, 46 Brooklyn L. Rev. 249, 267 (1980).)

Preserving the integrity of the courts is not such an idle or meaningless task that we may safely ignore the abuses disclosed by the record in this case. If judicial integrity is to be meaningful, we must do more than accord that principle vacant obeisance. Keeping the courts clean is a daily job; we must not relegate it to holiday observance. Justice Holmes viewed the problem as a choice between two conflicting goals, punishing criminals and preventing governmental lawlessness:

> "We have to choose, and for my part I think it a less evil that some criminals should escape than that the government should play an ignoble part." *Olmstead*, 277 U.S. 438, 470, 72 L. Ed. 944, 953, 48 S. Ct. 564, 575 (Holmes, J., dissenting).

This need to preserve the courts from seediness is not just a banner waved by dissenters; the role of policy in reaching decisions and the precise policy involved here are both continuing forces in law. First, we see policy at work in decisions as diverse as *Riggs v. Palmer* (1889), 115 N.Y. 506, 22 N.E. 188, and *Henningsen v. Bloomfield Motors, Inc.* (1960), 32 N.J. 358, 161 A.2d 69. *Riggs* involved a murderer's claim to the victim's estate; the murderer was an heir. Although positive law gave the murderer the estate, the court defeated the normal rule with the principle that one should not profit from wrongdoing. In *Henningsen*, the court applied considerations of public policy to pierce a car manufacturer's limitation of warranty. Dworkin cites the two cases to distinguish rules from principles and to illustrate the different ways they operate. (R. Dworkin, Taking Rights Seriously 22-28 (1977).) Applicable rules dictate a particular result; principles do not dictate results but may be used to justify departures from the rules. See also Barlow, *Entrapment and the Common Law: Is There a Place for the American Doctrine of Entrapment?* 41 Modern L. Rev. 266 (1978), for a discussion of Dworkin and the jurisprudential basis for the objective theory of entrapment.

*In re Friedman* (1979), 76 Ill. 2d 392, 392 N.E.2d 1333, was a disciplinary action against a prosecutor who had directed policemen to accept bribes and to perjure themselves in a scheme designed to ferret out unscrupulous attorneys. Although the six judges deciding the case split three ways, four of the six concluded that Friedman's tactics had stained the courts and were not excused on the grounds that the end justified the means.

The recent rise of the due process defense also reflects displeasure with government-sanctioned lawlessness, for the government's conduct is the controlling aspect in determining whether that defense applies. *United States v. Twigg* (3d Cir. 1978), 588 F.2d 373; *State v. Morris* (Minn. 1978), 272 N.W.2d 35; *People v. Isaacson* (1978), 44 N.Y.2d 511, 406 N.Y.S.2d 714, 378 N.E.2d 78.

In its zeal to enjoin a nuisance, the majority overlooks a fundamental policy of our legal system. I must dissent from this shortsightedness.