THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
MICHAEL P. KALUDIS, Defendant-Appellant.

First District (1st Division)   No. 85—2482

Opinion filed August 11, 1986.

Louis B. Garippo and Susan G. Feibus, both of Louis B. Garippo, Ltd., of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Joan S. Cherry, Peter D. Fischer, and Jane H. Miller, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE QUINLAN delivered the opinion of the court:

The defendant, Michael P. Kaludis, was indicted along with two other individuals on two counts of unlawful delivery of a controlled substance in violation of section 401 of the Illinois Controlled Substances Act (Ill. Rev. Stat. 1983, ch. 56½, par. 1401). One count alleged that the defendant and one codefendant delivered more than 30 grams of a substance containing methaqualone, and the other count alleged that the defendant and the other codefendant delivered less than 10 grams of a substance containing cocaine. The defendant was found guilty on both counts after a jury trial, but his codefendants were acquitted after being tried by the court. The defendant was sentenced to serve concurrent terms of imprisonment: seven years for the methaqualone offense and three years for the cocaine offense.

The defendant raised the following contentions on appeal: (1) the State failed to prove beyond a reasonable doubt that the methaqualone weighed more than 30 grams; and (2) the undercover police officer engaged in such outrageous conduct that the defendant's right to due process was violated.

The series of events leading up to the defendant's conviction began in February 1983 when a confidential informant introduced undercover police officer, Rafael Tovar, to Susan Baumgaerdner as "Bob Garcia." Thereafter, Baumgaerdner telephoned Tovar on February 26, 1983, and inquired as to whether he was interested in purchasing some cocaine from an individual identified as Mike. Tovar said that he was, and a meeting was scheduled for 4 p.m. that afternoon at Baumgaerdner's apartment. When Tovar arrived at the apartment at 4 p.m., Baumgaerdner informed him that Mike had not yet arrived. The defendant, Michael Kaludis, arrived at the apartment five minutes later accompanied by another individual introduced as Scott Martin. Tovar then purchased one gram of white powder purported to be cocaine from the defendant for $100. Baumgaerdner testified that, after Kaludis and Martin departed, Tovar gave her some cocaine which she immediately snorted. She testified that Tovar began to make sexual advances and the two eventually engaged in sexual intercourse. However, Tovar denied ever giving Baumgaerdner drugs or having any sexual contact with her. After leaving Baumgaerdner's apartment, Tovar conducted a field test on the white powder which indicated the possible presence of cocaine.

Baumgaerdner telephoned Tovar again on March 2, 1983, and asked whether he was interested in purchasing more cocaine. Tovar said that he was, and he met the defendant at Baumgaerdner's apart-

ment and purchased two grams of white powder purported to be cocaine from the defendant for $200. The result of a subsequent field test indicated the possible presence of cocaine.

On May 23, 1983, Baumgaerdner called Tovar again, and the two individuals drove to a location in Skokie to purchase cocaine from a source other than the defendant. After this transaction, Tovar placed Baumgaerdner under arrest and transported her to the Des Plaines police station. At the station, Tovar persuaded Baumgaerdner to arrange one more purchase from Kaludis. She telephoned the defendant and arranged a meeting for that evening.

Tovar arrived at Kaludis' residence in Mount Prospect at approximately 8:30 p.m. on the evening of May 23, 1983. The defendant exited his house, and the two proceeded to drive to a location in Glenview. Along the way, Kaludis inquired as to whether Tovar was also interested in purchasing some methaqualone tablets. Kaludis said that one of the people in Glenview had some for sale, and the price was $125 for 50 tablets. Tovar said yes; he would buy 100 tablets. When they arrived at the Glenview address, Kaludis exited Tovar's automobile and entered the residence. Kaludis reappeared shortly and handed Tovar a paper packet containing approximately one-half a gram of white powder purported to be cocaine, and Tovar gave Kaludis $50 which Kaludis took back into the house. Kaludis returned and told Tovar that the methaqualone tablets were not there, but the occupant was going to get them and would return within 30 minutes. Tovar and Kaludis then drove to a tavern in Glenview where they ordered drinks and waited. They returned to the house; Kaludis went inside; he returned to the automobile and gave Tovar a bag containing approximately 100 tablets. While the agreed-upon price was $250, for some undisclosed reason, Tovar was required to pay $265 for the tablets. Kaludis informed Tovar that another 300 methaqualone tablets were available for purchase. However, the money was required up front, and Kaludis said he would bring the tablets out afterwards. Tovar refused to do business in that manner, and when Kaludis attempted to take the money for the 100 tablets into the house, Tovar placed him under arrest. Kaludis was indicted on the basis of these transactions which occurred on May 23, 1983.

At trial, the State called Paul Titus, a forensic chemist employed by the Department of Law Enforcement, to testify concerning the scientific procedures he used to identify the substances delivered by the defendant on May 23. Titus testified that he determined the weight of the approximately 100 tablets to be 80.8 grams and the weight of the white powder to be 0.2 gram. He also said he performed a tablet-ballis-

tics test which, in essence, is a visual examination of all the tablets, and this visual examination revealed that all tablets exhibited the same physical characteristics. The tablets were all the same size, diameter, roundness, and thickness. The tablets also were all off-white in color and exhibited the same hardness. All tablets had the same markings, "Lemmon 714," which were markings used by a particular pharmaceutical company. However, it was Titus' opinion, after examining the tablets, that the tablets were "counterfeit." By counterfeit, Titus explained that he meant that the tablets were not manufactured by the Lemmon Company whose markings appeared on the tablets. He further noted that the tablets exhibited identical lettering characteristics, bevelling and scoring. Based upon his examination, Titus formed an opinion that all the tablets were manufactured on the same tablet press with the same set of dies.

Titus then performed six color tests on three randomly selected tablets. The results of the color tests indicated the possible presence of methaqualone. Titus next performed a thin-layer chromatography test on another three tablets. The results also indicated the possible presence of methaqualone.

Titus testified that he then attempted to extract a purified form of methaqualone from three more randomly selected tablets. The extraction process yielded a residue upon which Titus conducted gas-chromatographic and mass-spectrographic analyses. The results of this final procedure conclusively indicated the presence of methaqualone in the material analyzed. Based upon the results of his entire testing procedure, Titus opined that all 100 tablets contained methaqualone. Titus admitted that some counterfeit tablets may not contain a controlled substance or may contain different controlled substances. However, he stated that he had never experienced a situation where counterfeit tablets came in one bag, were found to be alike pursuant to a tablet-ballistics test, and contained different controlled substances.

Titus performed a similar series of nonconclusive tests and one conclusive test on randomly selected samples of the white powder alleged to be cocaine, which had also been purchased on May 23, 1983. He subjected the sample he had collected to infrared spectrographic analysis, and the results conclusively indicated the presence of cocaine in the material tested. Titus further determined that the cocaine was in its naturally occurring state, *i.e.*, it was not synthetically produced. Based on these tests and their results, Titus opined that the entire packet of white powder contained cocaine.

The defense presented its own expert witness, Vel Vasan, who, at the time of trial, was working as an attorney and had not worked in

the field of forensic chemistry for 10 years. Vasan examined Titus' testing procedures and testimony. Vasan testified that the procedure followed by Titus only proved with certainty that one tablet contained methaqualone. Titus could not state, Vasan contended, with any reasonable degree of scientific certainty that all 100 tablets were in fact methaqualone. Vasan also testified that the conclusive procedure utilized by Titus, the gas-chromatographic and mass-spectrographic analyses, did not require the total destruction of the tablets tested, and that a conclusive determination could be performed on five tablets in 10 to 15 minutes.

At the conclusion of the trial, the jury found the defendant guilty on both counts. The trial judge denied defendant's motion for a new trial and sentenced the defendant as indicated above. This appeal followed.

Initially, the defendant contends that his conviction for delivery of more than 30 grams of a substance containing methaqualone was fundamentally unfair and violated his right to due process. He claims that the State failed to prove an essential element of the offense beyond a reasonable doubt, *i.e.*, that the methaqualone weighed more than 30 grams. The essence of the defendant's argument is that the testing procedures employed by the State's expert, while admittedly adequate in other situations, were inadequate when dealing with counterfeit substances which may possibly vary in content. Kaludis claims that evidence based upon such improper procedures results in evidence based upon mere speculation and cannot support the jury's guilty verdict. Additionally, the defendant asserts that improper remarks made by the prosecutor during rebuttal argument about the defendant's failure to test the tablets precluded the jury from returning a guilty verdict on the lesser included offense of delivering a smaller amount. Thus, the defendant says that this court should reverse his conviction and remand the matter for sentencing for the lesser offense. We disagree, and for the reasons set forth below, affirm the defendant's conviction.

■ The issue of whether the substance delivered contains a controlled substance proscribed by the Illinois Controlled Substances Act (Ill. Rev. Stat. 1983, ch. 56½, par. 1100 *et seq.*) is a question of fact for the jury to resolve. (*People v. Ohley* (1973), 15 Ill. App. 3d 125, 131, 303 N.E.2d 761.) Because it is the jury's duty to assess the credibility of witnesses and weigh conflicting evidence, a court of review should not reverse the finding of the jury unless its verdict is clearly against the manifest weight of the evidence. 15 Ill. App. 3d 125, 303 N.E.2d 761.

■ In the prosecution of a drug offense, the State need not count

and weigh each individual capsule or tablet from every bag or container recovered from a defendant. (*People v. Yosell* (1977), 53 Ill. App. 3d 289, 368 N.E.2d 735.) A chemist need only test random samples in order to be qualified to render an opinion as to the makeup of the entire substance before him. (*People v. Games* (1981), 94 Ill. App. 3d 130, 418 N.E.2d 520; *People v. Yosell* (1977), 53 Ill. App. 3d 289, 368 N.E.2d 735; *People v. Kline* (1976), 41 Ill. App. 3d 261, 354 N.E.2d 46; *People v. Hering* (1975), 27 Ill. App. 3d 936, 327 N.E.2d 583; *People v. Ohley* (1973), 15 Ill. App. 3d 125, 303 N.E.2d 761.) This rule is one of reason and practicality. (*People v. Games* (1981), 94 Ill. App. 3d 130, 418 N.E.2d 520.) As the court said in *People v. Hering* (1975), 27 Ill. App. 3d 936, 943, 327 N.E.2d 583: "The fact that only a part of the material is positively identified as containing contraband only goes to the weight of the evidence rather than its admissibility."

However, such a rule is not without limitation. In both *People v. Ayala* (1981), 96 Ill. App. 3d 880, 422 N.E.2d 127, and *People v. Games* (1981), 94 Ill. App. 3d 130, 418 N.E.2d 520, cited by the defendant here, the defendants there were charged with possession of heroin and delivery of cannabis, respectively. The severity of the offense charged in each case was based upon the amount of contraband contained in two packages. The State's chemists in each of those cases conclusively tested only one of the two packages but rendered opinions that both packages involved in the case contained contraband. Thus, the chemists employed in those cases failed to conclusively determine the presence of contraband in a random sample taken from one of the two packages. This court refused to permit the amount of substance in the package from which no random sample was conclusively analyzed to be considered in determining the severity of the offense committed. Accordingly, because the amount contained in the package conclusively tested in each case could not sustain the severity of the offense charged, the convictions of the defendants in both *Ayala* and *Games* were reduced to the lesser included offenses, *i.e.,* offenses dealing with smaller amounts of contraband.

The defendant, here, contends that while these cases may be factually distinguishable from this case, the principle is the same, *i.e.,* random sampling permits an expert's testimony concerning the whole only where the sample is in fact related to and was representative of the whole substance. He asserts that this court's prior cases approving random sampling dealt with substances that were homogeneous, and, additionally, here, the substance was in fact counterfeit, *i.e.,* the tablets were falsely marked as being tablets of a known manufacturer. Also, the defendant asserts that the prior cases did not involve a situa-

tion where the defense produced its own expert who disputed the testimony of the State's expert. Thus, the defendant argues that under the circumstances of the instant case expert testimony concerning the whole substance without testing the whole substance is impermissible. The defendant also claims the use of expert testimony of this type, *i.e.,* expert testimony based on random sampling, is no longer needed because new technology does not require total destruction of a tablet in order to conclusively determine its chemical composition, and numerous determinations can now be made in a relatively short period of time.

The defendant here was charged under section 401 of the Illinois Controlled Substances Act, which makes it "unlawful for any person [to] knowingly *** deliver *** a controlled or counterfeit substance." (Ill. Rev. Stat. 1983, ch. 56½, par. 1401.) "Counterfeit substance" is defined in the Act as "a controlled substance, which *** without authorization bears the trademark, trade name, or other identifying mark, imprint, number or device, or any likeness thereof, of a manufacturer, distributor, or dispenser other than the person who in fact manufactured, distributed, or dispensed the substance." Ill. Rev. Stat. 1983, ch. 56½, par. 1102(h).

■ Our examination of the record clearly indicates that the substance involved in the case was a "counterfeit" substance as described in the Act. The uncontroverted testimony of the State's expert indicates that the tablets were not manufactured by the Lemmon Company despite the markings "Lemmon 714," but in every other regard they were identical and in his opinion were manufactured on the same tablet press with the same dies. The mere fact that these tablets were counterfeit as described in the Act did not require a departure from the rule that expert opinion testimony based upon random-sampling techniques is sufficient evidence with which the State could use to prove beyond a reasonable doubt that the entire material contained a controlled substance. The term "counterfeit" here only referred to an improperly marked drug, which was a controlled substance, that was unlawfully sold, possessed or delivered. Hence, the sole question to be answered before an expert opinion based on random sampling would be allowed is whether the substance was homogeneous. See *People v. Ayala* (1981), 96 Ill. App. 3d 880, 422 N.E.2d 127; *People v. Ohley* (1973), 15 Ill. App. 3d 125, 303 N.E.2d 761.

■ There is sufficient evidence in the record before us to conclude that the tablets were in fact homogeneous. The State's expert testified that, upon visual examination, all the tablets were the same size, shape, color and density. Additionally, this record fails to demonstrate

that any test performed by Titus yielded a result indicative of differing compositions among the tablets tested or that they were other than homogeneous.

■ Furthermore, we find that the defendant's argument regarding the testimony of his own expert unpersuasive. Vasan's testimony did not challenge the scientific methods or procedures employed by Titus, nor did he dispute the results of the tablet-ballistics test. The defense expert's only conclusion was that the procedure followed by Titus only proved that one out of the approximately 100 tablets contained methaqualone, and that he did not believe that Titus could state with a reasonable degree of scientific certainty that all of the tablets contained methaqualone. However, as noted, Titus disagreed with the conclusion of the defendant's expert.

■ ■ A testing procedure conducted on random samples never conclusively demonstrates anything about the entire substance in issue. It only permits an expert, if the substance is homogeneous, to render his opinion as to the entire substance, including those portions not tested. As such, random sampling provides a sufficient basis for proving beyond a reasonable doubt that all tablets contain a controlled substance. (*People v. Yosell* (1977), 53 Ill. App. 3d 289, 368 N.E.2d 735.) The fact that the expert opinion is based upon results of analyses conducted on randomly selected samples goes only to the weight of such evidence used by the jury to determine if in fact the material contains the controlled substance. (*People v. Ohley* (1973), 15 Ill. App. 3d 125, 126, 303 N.E.2d 761.) Further, the testimony of the defense expert, who had not worked in the field of chemistry for 10 years, was also just another factor for the jury to consider when making that factual determination.

■ Accordingly, we find that there was sufficient evidence before the jury for it to conclude that the tablets contained more than 30 grams of methaqualone. Therefore, we hold here that an expert's opinion based upon the results of tests conducted on randomly selected tablets exhibiting similar characteristics is adequate, as accepted by the jury, to prove beyond a reasonable doubt that all the tablets in question contain the proscribed controlled substance.

■ The defendant raises two other contentions in this appeal. First, Kaludis contends that improper comments made by the prosecutor during rebuttal argument precluded the jury from returning a guilty verdict on the lesser included offense of delivery of less than 30 grams of methaqualone. The prosecutor stated during rebuttal that the defense expert "had every right to do tests on this if he wanted to. And I suggest to you that the reason they didn't have tests done is

because they are afraid what they might find out." However, the defense counsel objected to the comment, the trial court sustained the objection, and the prosecutor moved off the subject.

Where a timely objection is made at trial to an improper remark made by counsel to the jury, the court usually corrects the error by sustaining the objection unless the error is so damaging that such action cannot erase the comment's prejudicial effect. (*People v. Carlson* (1980), 79 Ill. 2d 564, 404 N.E.2d 233; *People v. Baptist* (1979), 76 Ill. 2d 19, 389 N.E.2d 1200; *cf. People v. Garreau* (1963), 27 Ill. 2d 388, 189 N.E.2d 287.) Under the circumstances here, we cannot say that the defendant was so substantially prejudiced by the comment that it constituted a material factor in his conviction, and thus, we find that the error was properly corrected by the trial court. See *People v. Cisewski* (1986), 144 Ill. App. 3d 597; *People v. Smylie* (1981), 103 Ill. App. 3d 679, 431 N.E.2d 1130.

■■ Second, the defendant contends that the undercover police officer engaged in such outrageous conduct that the defendant's right to due process was violated. Kaludis claims that Rafael Tovar gave illegal drugs to Susan Baumgaerdner and also had sex with her. Initially, we note that not only was evidence of these claims controverted, but the alleged misconduct did not even involve the defendant. Furthermore, whatever may have transpired between Tovar and Baumgaerdner is in no way related to the defendant committing the offenses charged here, nor does the defendant claim he was somehow entrapped by the conduct. The basis of a claim that a law-enforcement agent's conduct with respect to the defendant was so outrageous that it violated due process is that the conduct complained of must somehow, at the very least, assist the defendant in committing the crime and, thus, entrap him. (See *Hampton v. United States* (1976), 425 U.S. 484, 48 L. Ed. 2d 113, 96 S. Ct. 1646; *United States v. Russell* (1973), 411 U.S. 423, 36 L. Ed. 2d 366, 93 S. Ct. 1637. But see *People v. Johnson* (1984), 123 Ill. App. 3d 363, 462 N.E.2d 948; *People ex rel. Difanis v. Boston* (1981), 92 Ill. App. 3d 962, 416 N.E.2d 333.) As stated before, this simply is not the case, as the alleged conduct of the law-enforcement agent complained of here, in any event, did not involve the defendant.

Accordingly, for the reasons set forth above, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

CAMPBELL and O'CONNOR, JJ., concur.