THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* RICKY T. JOHNSON, Defendant-Appellant.

Second District   No. 82—987

Opinion filed April 11, 1984.

Marcia L. Smith, of Michael L. Pritzker, Ltd., of Chicago, for appellant.

Daniel Doyle, State's Attorney, of Rockford (Phyllis J. Perko and Judith M. Pietrucha, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE UNVERZAGT delivered the opinion of the court:

The defendant, Ricky T. Johnson, was found guilty of unlawful delivery of 30 grams or more of a controlled substance containing cocaine (Ill. Rev. Stat. 1981, ch. 56½, par. 1401(a)(2)) by a jury in the circuit court of Winnebago County, and the trial court sentenced him to six years in the Department of Corrections.

He appeals raising three issues: (1) whether the conduct of the law enforcement officers was so outrageous that the defendant's constitutional right to due process of law was violated; (2) whether the trial court erred in failing to instruct the jury on the defendant's defense of outrageous government conduct; and (3) whether the trial court erred in limiting the defendant's cross-examination of special agent LaBarge.

The thrust of the defendant's arguments are that special agent LaBarge of the Illinois Department of Law Enforcement used a house

of prostitution as his "front" and a prostitute and a pimp actively engaged in prostitution in order to engage individuals in the commission of offenses, thus abusing governmental power.

The evidence at trial disclosed the following: Joseph J. LaBarge, a special agent of the Illinois Department of Law Enforcement, with responsibilities in the undercover surveillance of narcotics traffic, testified that he first met the defendant on February 3, 1981, while he was working in an undercover role out of the Joliet area in Will County. In that capacity, LaBarge related that he and his supervisor, Carlos Hevia, went to a private "swingers" sex club in Aurora, Illinois. He admitted that he had been there on a number of prior occasions. The State's objection was sustained when LaBarge was asked who invited him. Officer LaBarge stated that he did not know if there was a membership or entry fee for this "club" because he was always allowed to enter without paying. LaBarge was admitted to the club by a man known as Frankie Herbert who LaBarge knew managed the club. Objections by the State to questions regarding LaBarge's prior relationship with Frankie Herbert and Herbert's prior drug sales to LaBarge were sustained.

LaBarge described the club as a two-story dwelling with a bar and stereo on the first floor and four bedrooms containing nothing other than mattresses on the second. LaBarge stated that after their arrival on February 3, 1981, he and Hevia went upstairs with Herbert's girl friend, Rhonda. In spite of their tousled and disheveled appearance when they returned downstairs, LaBarge claimed that they did not have any sexual relations with Rhonda but wanted to appear as though he had. LaBarge stated that he, Hevia and Rhonda were waiting for the defendant to arrive. LaBarge was unclear as to who introduced the defendant to them, stating that it was either Frankie or Rhonda. LaBarge told the defendant that he was self-employed in the home remodeling business. LaBarge and the defendant had a short conversation on narcotics. LaBarge told the defendant that he wanted to buy a gram of cocaine.

LaBarge stated that later that night he took a gram of cocaine off a triple beam scale that was on a desk by the front door of the club. He did not pay any money for the cocaine. LaBarge stayed at the club after the defendant left. LaBarge noticed that the scale remained at the club.

LaBarge also stated that there was another person, Hugh Farrell, at the club that night when his conversation with the defendant took place. LaBarge stated that he had known of Hugh Farrell before that night. The State's objections were sustained when counsel for the de-

fense sought information regarding prior arrests of Farrell by Agent LaBarge.

Officer LaBarge testified that his next contact with the defendant occurred in the afternoon of April 1, 1981, when the defendant unexpectedly called the agent's "undercover" telephone number at his Joliet office. The defendant asked LaBarge if he was still interested in buying "two tickets" which LaBarge understood to mean two ounces of cocaine. The defendant stated that the price was $2,000 per ounce. LaBarge accepted. Although LaBarge wanted the defendant to come to Will or Kane County, he agreed to meet the defendant the next day about 3 p.m. at a K mart shopping center in Rockford, Illinois.

LaBarge said that on April 2, 1981, he and his six special agents from Joliet arrived in Rockford shortly after 3 p.m. They went to the Cherry Valley Mall where they met with Detective Kennett of the De-Kalb County sheriff's office and deputies from the Winnebago County sheriff's office and officers of the Rockford police department.

LaBarge drove to the K mart shopping center. He parked in the middle of the parking lot. The other police officers were scattered throughout the lot. After about 10 minutes, a man LaBarge identified as the defendant arrived in his car. The defendant pulled alongside LaBarge's car and they discussed the transaction. The defendant wanted to leave the area but LaBarge did not want to go. Finally, La-Barge told the defendant that he had to check with some people because not all of the money was his.

LaBarge said he went into the K mart and met with special agent Earl Hernandez. LaBarge returned to his car and told the defendant he would follow him. The defendant told LaBarge that the "stuff" was in the defendant's pickup truck at a body shop.

LaBarge stated that he followed the defendant's car to the Keller Body Shop on Kishwaukee Street in Rockford. After parking their cars, the defendant pointed to a pickup truck and told LaBarge to go over to the truck and act like he was interested in purchasing it while the defendant got the keys. LaBarge went to the truck, opened the hood and looked inside. The defendant returned with the keys and told LaBarge to start the truck as though he was interested in it. He complied.

After LaBarge turned the engine off, he asked the defendant where the "stuff" was. The defendant replied that it was under the right floor mat. However, LaBarge could not find it when he picked up the mat. The defendant told the agent to slide over and he would show LaBarge where it was. LaBarge partially slid down the seat and the defendant got in the truck. The defendant pointed underneath the

center section of the seat.

LaBarge testified that he reached under the seat and found two plastic bags. The two men sat up at that point to get out of the truck. They were surrounded by police officers and the defendant was placed under arrest.

LaBarge said that there was $4,000 in official advance funds in the trunk of his car during the transaction. He identified the two plastic bags taken from the pickup truck, which had white powder in them, later identified as cocaine.

Richard Paulas, a forensic scientist with the Illinois Department of Law Enforcement, testified that People's exhibit No. 1 contained cocaine. There was 27.6 grams in one bag and 27.9 in another.

Following the State's case in chief, the defendant renewed his motion to suppress the evidence, which was denied. His motion for a directed verdict was denied.

The defendant testified on his own behalf. His presentation of the facts differed from LaBarge's. The defendant admitted that he used cocaine. He knew Rhonda for about three or four years. She was a prostitute who worked out of the "swingers" club in Aurora. Rhonda had introduced the defendant to Frankie Herbert about three or four years ago. The defendant knew of the club through Herbert. He had been there on several occasions. The defendant saw people use cocaine at the club and he had also used cocaine there. He said he had been upstairs with Rhonda in the bedrooms.

The defendant said he never sold any drugs at the club. He went to the club on February 3, 1981, after Herbert called him. Herbert wanted the defendant to bring the registration papers on a dog which the defendant had sold to Herbert. Herbert told the defendant that Rhonda was free that night if he wanted any sexual activity. When the defendant arrived, Herbert took the papers and gave the defendant some money for them.

Herbert told the defendant that Rhonda was busy with someone. He asked the defendant for some cocaine for the man (LaBarge) upstairs with Rhonda. The defendant had about half a gram to a gram with him. The defendant gave the cocaine to Herbert but took no money for it. He said that Herbert would pay him back in kind. The defendant had done this before.

The defendant was then introduced to "Joe" (LaBarge) when LaBarge and Rhonda came downstairs. Rhonda had on a "nightie" and LaBarge had on jeans and shoes. The defendant and LaBarge had a conversation in which the defendant told LaBarge that he was in the car business. LaBarge expressed an interest in buying a truck. La-

Barge took the defendant's phone number but the defendant did not get LaBarge's number. The defendant left the club.

According to the defendant, LaBarge called him on April 1, 1981, and asked about buying a truck. LaBarge also asked the defendant if he could get LaBarge two "tickets." At first the defendant was not clear as to what he meant but then understood "tickets" to mean cocaine from further conversation. LaBarge wanted an ounce but the defendant did not know if he could obtain that much. He had only obtained grams in the past.

The defendant took LaBarge's phone number in order to let LaBarge know if he could get an ounce. LaBarge told the defendant he would not pay more than $2,000 an ounce. The defendant called LaBarge in the afternoon and said he could get the cocaine. LaBarge wanted the defendant to drive down to the Aurora area with the truck and the cocaine. The defendant refused. LaBarge agreed to come to Rockford but wanted two ounces since he was traveling so far. When the defendant expressed doubts about obtaining it, LaBarge said he would have the money for two ounces.

The defendant said he called the person he got his cocaine from and arranged to obtain two ounces of cocaine. The defendant was going to get about two grams of cocaine for his own use for doing it. However, the defendant said he did not pick up the cocaine but someone put it in his truck. The defendant was told that it was ready for the deal. The defendant went to the truck and took a little bit of cocaine from each bag for himself.

In further testimony, the defendant explained meeting LaBarge at the K mart, going to the body shop to see the truck, pointing out where the cocaine was in the truck, and being arrested. This portion of the testimony did not substantially conflict with LaBarge's.

On cross-examination, the defendant repeated many of the points he already made on direct. He emphasized the fact that he only handled the cocaine when he took his portion from the bags. The defendant said he did not use cocaine since he was arrested in April 1981.

The State called LaBarge in rebuttal. LaBarge said he did not call the defendant on April 1, 1981, but received a call from the defendant. LaBarge did not threaten the defendant to sell him cocaine. He did not discuss buying a truck with the defendant at the Aurora club on February 3, 1981. They discussed the possibility of LaBarge buying cocaine in the future, and the defendant said it was possible.

The State claims that the defendant has waived consideration of the first issue. The State points out that the defendant is arguing that the trial court erred in denying his motion for directed verdict at the

close of the State's case in chief. The State argues that because the defendant introduced evidence he has waived any appeal of the denial of the directed verdict. (*People v. Taglia* (1979), 76 Ill. App. 3d 199.) The State notes that the defendant's motion was based on his argument that the State failed to prove delivery. The defendant also renewed his motion to suppress the evidence on the added ground that the evidence was seized as the result of outrageous government conduct.

The defendant's motion for directed verdict alleged the failure of the State to establish delivery. The court denied that motion and the defendant does not raise the delivery issue on appeal. The defendant now claims a due process violation based on "outrageous conduct." He presented this issue in a pretrial motion to dismiss, attempted to have the jury instructed on the issue, and presented it in his post-trial motion.

■ To dismiss the defendant's argument on the basis of waiver would place form over substance. (*People v. Taglia* (1979), 76 Ill. App. 3d 199.) In substance the defendant has argued that the trial court erred in failing to vacate the verdict or grant a new trial. The issue is not waived.

The defendant raised the defense of entrapment during the trial. To establish entrapment the government must, for the purpose of obtaining evidence, originate the crime and induce the defendant to commit it; and the defendant must be an "innocent" person who would not have committed the crime had he not been induced. (*People v. Marshall* (1981), 101 Ill. App. 3d 244, 247.) The predisposition of the defendant as well as the government involvement must be considered. *People v. Cross* (1979), 77 Ill. 2d 396.

During the trial, the defendant tried to argue that his actions did not constitute "delivery." The defendant could not deny the commission of the offense and at the same time claim entrapment. (*People v. Arriaga* (1981), 92 Ill. App. 3d 951.) Despite this fact, the court instructed the jury on entrapment. The jury rejected the entrapment defense and found the defendant guilty.

■ The defendant intertwines two related but distinct concepts in his argument for reversal. First, the defendant claims that there was entrapment as a matter of law (based on the law enforcement officers' conduct) and, second, that the outrageous government conduct violated his right to due process of law. He intertwines the two throughout his argument in support of his claim for reversal based on outrageous government conduct. To the extent that the defendant argues that he was entrapped as a matter of law, we reject the claim.

The question of entrapment in a jury trial is one for the jury unless entrapment exists as a matter of law. *People v. Tipton* (1980), 78 Ill. 2d 477; *People v. Gresham* (1981), 96 Ill. App. 3d 581.

The supreme court in *People v. Cross* (1979), 77 Ill. 2d 396, rejected a *per se* rule that a conviction for the unlawful sale of narcotics could not stand when a police informer supplied the drugs. The supreme court pointed out that predisposition of the defendant to commit the crime must be considered. 77 Ill. 2d 396, 405.

In *People v. Tipton* (1980), 78 Ill. 2d 477, the supreme court reversed the appellate court which found that the defendant was entrapped as a matter of law. The supreme court reviewed the evidence presented to the jury and found no basis to set aside the verdict. The jury could have determined that the defendant was predisposed to commit the offense, thus rejecting the offense of entrapment notwithstanding the involvement of a narcotics agent and an informer. 78 Ill. 2d 477, 487.

In reviewing the entrapment defense in the instant case, the court is to determine all the defendant's testimony in the light most favorable to him. (*People v. Husted* (1981), 97 Ill. App. 3d 160.) The defendant admitted using cocaine; he admitted giving some cocaine to the manager of the club in Aurora on the night he first met LaBarge; and he did not hesitate in agreeing with LaBarge to provide the cocaine requested, although he had reservations about securing the amount and traveling to meet LaBarge. The defendant was able to obtain the two ounces of cocaine from his "source." He also took a small amount of the cocaine from each of the two bags that were going to LaBarge as part of the deal he made with his "source."

There was sufficient evidence to support a jury finding that the defendant was predisposed to commit the offense. (*People v. Tipton* (1980), 78 Ill. 2d 477.) In fact, the defendant does not argue on appeal that he was not predisposed. Therefore, the defendant's claim that there was entrapment as a matter of law must fail.

■■ The second contention of the defendant is that the conduct of the law enforcement officers was so outrageous that his conviction cannot stand, notwithstanding his predisposition. Although the defendant describes the defense as the "entrapment-due process" defense, his claim that outrageous government conduct bars his conviction is a separate defense from entrapment.

The outrageous government conduct defense draws its breath from two United States Supreme Court opinions. While the entrapment defense was first recognized by the United States Supreme Court in *Sorrells v. United States* (1932), 287 U.S. 435, 77 L. Ed.

413, 53 S. Ct. 210, and again considered in *Sherman v. United States* (1958), 356 U.S. 369, 2 L. Ed. 2d 848, 78 S. Ct. 819, two subsequent opinions involving entrapment opened the way for the constitutional defense of outrageous government conduct.

The first case was *United States v. Russell* (1973), 411 U.S. 423, 36 L. Ed. 2d 366, 93 S. Ct. 1637, where the defendant was convicted of having unlawfully manufactured and processed methamphetamine and having sold and delivered the drug. His defense was entrapment. The United States Court of Appeals for the Ninth Circuit reversed the conviction because an undercover agent supplied an essential chemical used to manufacture methamphetamine. The United States Supreme Court reversed.

The defendant argued in the Supreme Court that the level of the government agent's involvement in the manufacture of methamphetamine was so high that criminal prosecution of the drug's manufacture was a violation of due process. However, the Supreme Court found that the chemical supplied by the agent not only could have been obtained without the agent's intervention but was obtained by the defendant.

The Supreme Court acknowledged, however, the potential validity of the due process defense. The court stated:

> "While we may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction, cf. *Rochin v. California* [1952], 342 U.S. 165, [96 L. Ed. 183, 72 S. Ct. 205,] the instant case is distinctly not of that breed." 411 U.S. 423, 431-32, 36 L. Ed. 2d 366, 373, 93 S. Ct. 1637, 1643.

The defendant here relies on the language found in *United States v. Russell* (1973), 411 U.S. 423, 36 L. Ed. 2d 366, 93 S. Ct. 1637, in arguing that his case presents a situation where his due process rights were violated and cites *Hampton v. United States* (1976), 425 U.S. 484, 48 L. Ed. 2d 113, 96 S. Ct. 1646. In *Hampton,* the defendant acknowledged that the entrapment defense was not available, but argued that his due process rights were violated because a government informant allegedly supplied the drug which he was convicted of selling. The Supreme Court rejected the defendant's argument, noting in *Russell* and *Hampton* that the government agents acted in concert with the defendants and the defendants were predisposed to commit the offenses. The opinion went on to state that:

> "The limitations of the Due Process Clause of the Fifth Amendment come into play only when the Government activity

in question violates some protected right of the *defendant*." (*Hampton v. United States* (1976), 425 U.S. 484, 490, 48 L. Ed. 2d 113, 119, 96 S. Ct. 1646, 1650.) The court determined that the police conduct in *Hampton* did not deprive the defendant of any right.

The State in the instant case notes that the defendant has not presented an Illinois case which recognizes the outrageous government conduct defense. However, the State does not argue against the possibility of such a defense but asserts that the facts of this case do not support a finding of outrageous government conduct. The State cites to *United States v. Twigg* (3d Cir. 1978), 588 F.2d 373, where the United States Court of Appeals determined that the police involvement was so overreaching that it barred prosecution as a matter of due process of law. The State distinguishes the *Twigg* facts from the instant case. In *Twigg*, a government informer suggested the establishment of a laboratory to manufacture "speed." The government supplied a chemical used to make "speed," made arrangements with chemical supply houses to provide the other ingredients, provided the production site, and a government agent was completely in charge of the operation. The defendants in *Twigg* were found predisposed to commit the offense at the trial level. On appeal, the court examined police conduct which it characterized as "so overreaching as to bar prosecution of the defendants as a matter of due process of law." 588 F.2d 373, 377.

*People ex rel. Difanis v. Boston* (1981), 92 Ill. App. 3d 962, and *People ex rel. Carey v. 1975 Mercedes 4-Door* (1980), 86 Ill. App. 3d 893, discuss the defense of outrageous government conduct.

In *Difanis*, the defendant had been enjoined from maintaining a nuisance, *i.e.*, a place of prostitution. On appeal, he claimed that the trial court erred in denying his *in limine* motion to suppress certain evidence among other issues not relevant. The motion was based on a showing that in the course of the investigation three men working for the law enforcement officers actually engaged in sexual activity with female employees in the place of prostitution. The defendant claimed that the State's Attorney's conduct in recruiting and directing the agents to engage in such activity was so outrageous that it constituted a violation of his fundamental right to due process. The defendant acknowledged that entrapment was not available to him.

The appellate court recognized that the defendant's argument was novel in Illinois. It noted that where the defense was recognized in other jurisdictions, the remedy was not suppression but a bar to the action.

The State argued that the due process defense was merely the "objective" entrapment theory which was conclusively rejected in *People v. Cross* (1979), 77 Ill. 2d 396. However, the *Difanis* court found a valid distinction between the two based on *United States v. Russell* (1973), 411 U.S. 423, 36 L. Ed. 2d 366, 93 S. Ct. 1637. The court stated that *Cross* should not be interpreted to bar the due process defense. *People ex rel. Difanis v. Boston* (1981), 92 Ill. App. 3d 962, 966.

After examining case law, the court concluded in *Difanis* that the conduct of the government did not reach the "demonstrable level of outrageousness" which would bar the action or exclude the evidence. The court also noted that the plurality in *Hampton v. United States* (1976), 425 U.S. 484, 48 L. Ed. 2d 113, 96 S. Ct. 1646, found the essence of the due process defense to be a violation of a "protected right of the *defendant.*" No contention was made that an intrusion was made on the defendant's rights. 92 Ill. App. 3d 962, 967.

In *People ex rel. Carey v. 1975 Mercedes 4-Door* (1980), 86 Ill. App. 3d 893, the State brought an *in rem* action for forfeiture of a car used in delivery of a controlled substance. The owner of the car claimed on appeal that the forfeiture order violated his right to due process. He relied on *United States v. Twigg* (3d Cir. 1978), 588 F.2d 373. The appellate court found that there was no overreaching conduct in this case.

The facts in the case at bar are disputed, although the jury's verdict may be seen as a rejection of the defendant's version. Assuming the defendant's version to be the case, the conduct of law enforcement officers was not so outrageous that the defendant's fundamental right to due process of law was violated. It did not reach the "demonstrable level of outrageousness" required to bar conviction. *People ex rel. Difanis v. Boston* (1981), 92 Ill. App. 3d 962, 966-67.

■ In the defendant's second issue on appeal, he contends that the trial court erred in denying the defendant's instruction on outrageous government conduct. He claims the instruction was necessary to present the jury with the full theory of the defendant's defense of entrapment. The jury was instructed on the statutory defense of entrapment.

The Federal courts have addressed this issue in considering the due process defenses of outrageous government conduct. They have held that the question of whether the circumstances of the case demonstrate outrageous government conduct is a question of law for the court to determine. (*United States v. Wylie* (9th Cir. 1980), 625 F.2d 1371; *United States v. Szycher* (10th Cir. 1978), 585 F.2d 443; *United*

*States v. Johnson* (1st Cir. 1977), 565 F.2d 179.) *Wylie* and *Johnson* specifically held that no error occurred with the trial court's denial of a jury instruction on government involvement.

Based on the decisions of the Federal courts which have considered the outrageous government conduct defense, we find that the trial court did not err in denying the defendant's jury instruction. The question of outrageous government conduct is a matter of law for the court to determine. Besides, the instruction failed to adequately present the law as found in the plurality opinion in *Hampton.* The due process defense rested on a violation of a "protected right of the *defendant.*" (*Hampton v. United States* (1976), 425 U.S. 484, 490, 48 L. Ed. 2d 113, 119, 96 S. Ct. 1646, 1650.) The instant instruction had no such provision.

■ In the last issue, the defendant claims that the trial court erred in limiting the defendant's cross-examination of LaBarge concerning his relationship with Frankie Herbert and Hugh Farrell. The defendant states that the limitation denied him the opportunity to present direct evidence as to his theory of the defense. He also claims that the limitation prevented him from showing bias, motives and interests.

The defendant's post-trial motion does not contain a specific objection to the trial court's limitation of the defendant's cross-examination of LaBarge. The issue has not been preserved for review and has been waived. *People v. Jackson* (1981), 84 Ill. 2d 350; *People v. Heidorn* (1983), 114 Ill. App. 3d 933.

The waiver rule is not absolute. If it is plainly apparent from the record that an error affecting substantial rights was committed, plain error can be considered as a way of circumventing the rule. *People v. Jackson* (1981), 84 Ill. 2d 350.

The limitation of cross-examination did not rise to the level of plain error. It was apparent from the defendant's testimony that Herbert was an informant. LaBarge said that Herbert and he discussed the transaction that was going to occur on February 3, 1981. There was sufficient evidence on the defendant's theory of the case without knowing whether LaBarge knew Herbert prior to February 3, 1981, arrested Herbert or bought narcotics from him. LaBarge's motive, bias or interest would not have been illuminated any further without the limitation.

Hugh Farrell was merely present at the club on February 3, 1981. There is no indication from the record that he was involved in this transaction.

The limitation of cross-examination was not plain error and was

waived for purposes of review.

The judgment of the circuit court of Winnebago County is affirmed.

Affirmed.

LINDBERG and VAN DEUSEN, JJ., concur.