500 A.2d 853

COMMONWEALTH of Pennsylvania, Appellant,

v.

Daniel M. MATHEWS.

COMMONWEALTH of Pennsylvania, Appellant,

v.

Timothy R. ZERR.

Superior Court of Pennsylvania.

Argued May 14, 1985.

Filed Nov. 8, 1985.

Marcia Ziki, Assistant District Attorney, Warren, for Commonwealth, appellant (at 823 and 824).

Michael J. Healey, Pittsburgh, for appellees (at 823 and 824).

Before SPAETH, President Judge: and ROWLEY and WIEAND, JJ.

SPAETH, President Judge:

These are consolidated appeals by the Commonwealth from orders arresting judgment. Although the jury rejected appellees' arguments that they had been entrapped, *see* 18 Pa.C.S. § 313, and found them guilty of attempt to manufacture a controlled substance, the trial court, on post-verdict motions, arrested judgment because it found that the police conduct in this case was so outrageous that appellees were denied due process. We affirm.

■ Even where entrapment is not proved, police involvement in criminal activity may be so outrageous that a prosecution will be barred on due process grounds. In *United States v. Russell*, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973), the United States Supreme Court said:

> While we may some day be presented with a situation in which the conduct of law enforcement is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a

conviction, ... the instant case is distinctly not of that breed ... The law enforcement conduct here stops far short of violating that "fundamental fairness, shocking to the universal sense of justice," mandated by the Due Process Clause of the Fifth Amendment.

*Id.* at 431–32, 93 S.Ct. at 1643.

Three years later, in *Hampton v. United States*, 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976), the Supreme court affirmed a conviction despite arguments that police conduct in supplying heroin for later sale was so outrageous as to bar prosecution on due process grounds. Justice REHNQUIST, in a plurality opinion joined by Chief Justice BURGER and Justice WHITE, would have held that because the defendant had conceded that he was predisposed to sell heroin, he could not argue that due process barred his prosecution. Justice POWELL, in an opinion joined by Justice BLACKMUN, concurred but would have held that if police over-involvement in criminal activity reached a demonstrable level of outrageousness it would bar prosecution on due process grounds, despite predisposition. *Id.* at 495 n. 7, 96 S.Ct. at 1653 n. 7. Justices BRENNAN, STEWART, and MARSHALL dissented from the view espoused by Justice REHNQUIST and while agreeing with Justice POWELL that due process might bar prosecution in some cases, would have held that, even apart from due process, if police conduct is sufficiently offensive the defense of entrapment should bar a conviction. *Id.* at 497, 96 S.Ct. at 1653.

Many courts, including this court, have interpreted *Russell* and *Hampton* as in combination announcing the rule that the concept of fundamental fairness embodied in the due process clause of the Fifth and Fourteenth Amendments will bar conviction where police conduct has been "outrageous", even if entrapment is not shown. *See, e.g., United States v. Ward,* 696 F.2d 1315 (11th Cir.1983) *cert. denied* 461 U.S. 934, 103 S.Ct. 2101, 77 L.Ed.2d 308; *United States v. Gianni,* 678 F.2d 956 (11th Cir.1982) *cert. denied* 459 U.S. 1071, 103 S.Ct. 491, 74 L.Ed.2d 633; *United States*

*v. Gray,* 626 F.2d 494 (5th Cir.1980) *cert.* denied sub nom. *Fennell v. United States,* 449 U.S. 1038, 101 S.Ct. 616, 66 L.Ed.2d 500; *United States v. Twigg,* 588 F.2d 373 (3rd Cir.1978); *Commonwealth v. Minnich,* 324 Pa.Super. 339, 344 n. 3, 471 A.2d 869, 871 n. 3 (1984); *People v. Johnson,* 123 Ill.App.3d 363, 78 Ill.Dec. 829, 462 N.E.2d 948 (1984); *People v. Peppars,* 140 Cal.App.3d 677, 189 Cal.Rptr. 879 (1983); *Harrison v. State,* 442 A.2d 1377 (Del.Sup.1982).

In this case the trial court relied primarily on *United States v. Twigg, supra,* for its holding that the police involvement was so outrageous that appellees' convictions should be arrested. The facts of *Twigg* were as follows:

In October 1976 at the request of DEA [Drug Enforcement Agency] officials, Kubica [a police informant] contacted an acquaintance of twenty years, Henry Neville, to discuss setting up a speed laboratory. Neville expressed an interest and a discussion of the proposed operation ensued. Over the next several months numerous discussions took place between the two parties as arrangements were made to set up the laboratory. Some of the telephone conversations were recorded by Kubica on equipment supplied by the DEA. The tapes, introduced as evidence at trial, indicate that Neville assumed primary responsibility for raising capital and arranging for distribution of the product, while Kubica undertook the acquisition of the necessary equipment, raw materials, and a production site.

The Government proved to be of considerable assistance to Kubica in carrying out his part of the operation. DEA agents supplied him with two and one-half gallons of phenyl-2-propanone-a chemical essential to the manufacture of speed and the most difficult of the ingredients to obtain. The cost to the Government was $475.00, although the chemical could retail for twice as much. The DEA provided Kubica with about 20 percent of the glassware needed and a rented farmhouse in New Jersey in which to set up the laboratory. In addition, the DEA Officials made arrangements with chemical supply houses

to facilitate the purchase of the balance of the materials by Kubica under the business name of "Chem Kleen." Kubica personally bought all of the supplies (with the exception of one separatory funnel) with approximately $1,500.00 supplied by Neville.

On March 1, 1977, Neville introduced Kubica to William Twigg, who apparently got involved in the operation to repay a debt to Neville. Twigg accompanied Kubica on a trip to several chemical supply houses. Later that day, the laboratory was set up at the farmhouse. The laboratory operated for one week, producing approximately six pounds of methamphetamine hydrochloride. Kubica was completely in charge of the entire laboratory. Any production assistance provided by Neville and Twigg was minor and at the specific direction of Kubica. Twigg often ran errands for groceries or coffee, while Neville spent much of his time away from the farmhouse. On March 7, Neville left the farmhouse with the drugs in a suitcase. Kubica notified the DEA agents, who arrested Neville driving down the road. A search of the car revealed, in addition to the suitcase containing six pounds of methamphetamine hydrochloride, a Lysol can containing cocaine and some more speed. Twigg was arrested at the farmhouse.

588 F.2d at 375–376 (footnotes omitted).

Relying on *Russell* and *Hampton*, the Court of Appeals found that the involvement of the DEA, through its informant Kubica, was so outrageous that the due process clause of the Fifth Amendment barred the prosecution:

When Kubica, at the instance of the DEA, reestablished contact with Neville, the latter was not engaged in any illicit drug activity. Using Kubica, and actively participating with him, the DEA agents deceptively implanted the criminal design in Neville's mind. They set him up, encouraged him, provided the essential supplies and technical expertise, and when he and Kubica encountered difficulties in consummating the crime, they assisted in finding solutions. This egregious conduct on the part of

government agents generated new crimes by the defendant merely for the sake of pressing criminal charges against him when, as far as the record reveals, he was lawfully and peacefully minding his own affairs. Fundamental fairness does not permit us to countenance such actions by law enforcement officials and prosecution for a crime so fomented by them will be barred.

*Id.* at 381. (footnote omitted)

We agree with the trial court that the facts of this case are no less outrageous than were the facts in *Twigg.* Indeed, the facts here are in many respects very similar to the facts in *Twigg.*

On July 21, 1983, at approximately eleven o'clock p.m., appellees were arrested at a residence in a rural area of Warren County, Pennsylvania. N.T. 10. At the time of their arrest, various chemicals, bunsen burners, flasks, hoses and a formula for the manufacture of methamphetamine were found inside the residence. N.T. 10–17. While in the residence, Donald Bloser, a criminalist with the Pennsylvania State Police, observed a reaction taking place in an apparatus that had been set up on the kitchen. Bloser later finished the reaction, making methamphetamine. *Id.* He also found and analyzed a brown sludge and determined that it contained methamphetamine. *Id.* Appellees appeared to have been the only persons living in the residence. N.T. 35.

James Ramsey, a detective in the narcotics section of the Pittsburgh Police Department, testified that on June 21, 1983, he provided appellees with $300 so that they could rent the residence where they were arrested, and that on July 10 he provided them with $150, and on July 15, with $50, so that they could purchase chemicals necessary to produce methamphetamine. N.T. 164–65. Ramsey also testified that on July 11, 1983, he went to a printing company in Pittsburgh to order an embossed letterhead that referred to a fictitious research company, so that appellees could more easily acquire the chemicals necessary to produce methamphetamine. N.T. 165–66. In addition, Ramsey

testified that the police provided appellees with funds to purchase food while they were in Warren County. N.T. 165.

Steven Cox, a criminalist and chemist with the Forensic Science Division of Allegheny County, testified that on July 18, 1983, Detective Ramsey told him that appellees were having difficulty isolating the phenylacetone, an ingredient necessary to manufacture methamphetamine, N.T. 55, and asked if he could help appellees solve this problem. N.T. 56. Later that day Cox telephoned and spoke with appellee Mathews, who said that he was having difficulty isolating "P2P", N.T. 59–60, and that no "phase separation" had occurred, N.T. 61. Cox asked a series of questions to learn what Mathews had done to that point, and then discussed what he might do to remedy the problems he was having. N.T. 62. At one point in the conversation, Cox advised Mathews that for his testing to be accurate, the litmus paper used for testing had to be immersed in water. N.T. 66. Cox also advised Mathews that he should avoid creating an emulsion and then instructed him how to avoid an emulsion. N.T. 68. Cox also instructed Mathews how to test whether he had manufactured "P2P", N.T. 70, and how to isolate the "P2P" through a process called distillation, N.T. 71.

On July 21, 1983, Detective Ramsey again called Cox and told him that appellees were having difficulty. Cox advised Mathews that his difficulty was because "the reaction mixture had been hot enough to force the synthesis to take place," N.T. 77, and he instructed Mathews how to maintain an adequate temperature, N.T. 77–80.

At 9:30 p.m., on July 21, 1983, about one and one-half hours before appellees were arrested, Cox was again informed that appellees were having difficulty. N.T. 83. Cox went to Magistrate Dalton Hunter's office (the magistrate who issued the search and arrest warrants in this case), where he telephoned appellees. He and Mathews then discussed the manufacturing process "step by step". N.T. 85. Cox testified that the procedure related by Mathews

was "word for word" the same as that found in the Analytical Manual published by the Federal Government's Drug Enforcement Agency, N.T. 86, 96, and the same one that he had originally provided to Detective Ramsey, N.T. 96. At 10:40 that evening, about 20 minutes before appellees' arrest, Cox called appellees again to give instructions on how to "clean up" the brown sludge they had made to isolate the methamphetamine. N.T. 89.

Thomas C. Myers, who is also a criminalist in the Forensic Science Division of Allegheny County, testified that in July 1983, Detective Ramsey asked him to telephone appellees. N.T. 130. On July 11, 1983, Myers telephoned appellee Mathews and offered to help him with any problems with the synthesis of methamphetamine. N.T. 131. Myers then answered a series of questions Mathews had about the manufacture of methamphetamine. N.T. 133–36. Myers had two other conversations with Mathews, one some time between July 11 and July 21, 1983, and the other on July 21, the day of the arrest. In both of these conversations he advised Mathews on how to manufacture methamphetamine. N.T. 136–37.

■ The trial court found that this extensive police involvement in, and encouragement of, the manufacture of methamphetamine was outrageous and violated due process, especially since the Commonwealth presented no evidence as to who had originated the idea of manufacturing methamphetamine.[1] Said the court:

Here, it is patently apparent the Defendants were extremely inept in consummating the crime attempted. Our examination of the record compels us to conclude viewing the facts in the best light for the Commonwealth the Defendants were totally unable to commit the crime despite the "spoon feeding" by the Commonwealth. Indeed, a few hours before the Defendants' arrest we find

1. The Commonwealth argues that the trial court erred in denying it the opportunity to rebut appellant's evidence of entrapment, but so far as the record discloses, the Commonwealth offered nothing sufficient to overcome the admitted conduct of the police.

it shocking the Pittsburgh Police utilized a District Magistrate's court with the District Magistrate present to give instructions to the Defendants how to perfect the formula. We can only liken this conduct to a burglar being instructed on a step-by-step turn of a vault dial by the police so he may consummate the act. There is no question the Pittsburgh Police assisted in physically bringing property from Pittsburgh to Warren to manufacture the drug in a police vehicle, supplied money to purchase food and other supplies for the Defendants, the police supplied a manual with the proper formula to manufacture the drug, the police supplied a governmental chemist to instruct the Defendants on detailed steps through the formula. Despite all of this assistance Defendants came up with some "brown sludge" containing methamphetamine.

The police not only set the stage for the criminal act but also were principal players thereon without which Defendants could not have acted.

Slip op. of tr. ct. at 8–9.

We see no reason to disturb these findings.[2]

Affirmed.

WIEAND, J., files a dissenting opinion.

WIEAND, Judge, dissenting:

I respectfully dissent. Whether Mathews and Zerr had been entrapped was submitted to a jury which found that they had failed to prove police misconduct amounting to entrapment. The majority, apparently in the belief that the entrapment defense defined at 18 Pa.C.S. § 313 is inadequate to protect against police misconduct, seeks to create a new defense. By relying upon the due process clause of the Fourteenth Amendment, the majority would permit a person accused of crime to defend on grounds that police conduct was "outrageous" and violated "fundamental fair-

---

2. The Commonwealth's argument that the trial court erred in admitting hearsay, even if correct, does not affect the disposition of this case.

ness, shocking to the universal sense of justice." In my judgment, the creation of a new defense is unnecessary and unwise in this case. The facts do not warrant the discharge of the defendant-appellees.

The concept of outrageous police conduct violating due process originated in the federal courts. See: *United States v. Russell*, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973). It was articulated by the Court of Appeals for the Third Circuit in *United States v. Twigg*, 588 F.2d 373 (3rd Cir.1978). In holding that the government had been guilty of outrageous conduct, the Court emphasized the following: (1) the agents of the government had actually participated in setting up an illegal drug laboratory which did not exist prior thereto; (2) the scheme to manufacture illegal drugs had not originated with the defendants; and (3) the defendants had not possessed the know-how to manufacture drugs and had relied upon instructions received from government agents. *Id.* at 380, 381. The most telling of these factors, as other decisions have made clear, is the fact that the scheme to engage in criminal activity originated with the government agents. See: *Hampton v. United States*, 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976) (where defendant conceded that he had been predisposed to commit crime, he could not argue that due process barred his conviction); *United States v. Ward*, 696 F.2d 1315 (11th Cir.) (where police did not instigate a smuggling enterprise but merely offered assistance in transporting contraband to shore, there was no due process violation), *cert. denied*, 461 U.S. 934, 103 S.Ct. 2101, 77 L.Ed.2d 308 (1983); *United States v. Gianni*, 678 F.2d 956 (11th Cir.) (government's delivery and sale of marijuana to willing, experienced buyers for large sums of cash held not outrageous conduct), *cert. denied*, 459 U.S. 1071, 103 S.Ct. 491, 74 L.Ed.2d 633 (1982); *United States v. Gray*, 626 F.2d 494 (5th Cir.1980) (government informants suggested smuggling scheme and aided in arranging air transportation while defendants organized and ran operation, no misconduct found), *cert. denied*, 449 U.S. 1091, 101 S.Ct. 887, 66

L.Ed.2d 820 (1981). See also: *People v. Johnson*, 123 Ill.App.3d 363, 78 Ill.Dec. 829, 462 N.E.2d 948 (1984) (where police did not persuade defendant to commit crime, but merely provided the opportunity, court held there had been no due process violation); *People v. Peppars*, 140 Cal. App.3d 677, 189 Cal.Rptr. 879 (1983) (where defendant suggested committing crime and police merely provided information, police conduct was not outrageous); *Harrison v. State*, 442 A.2d 1377 (Del.Sup.1982) (where police merely provided opportunity to commit crime and defendant given several opportunities to withdraw, government conduct was not outrageous).

Having adopted the rule espoused by the Court of Appeals in *Twigg*, the majority then proceeds to expand its application to a situation in which no court has ever applied the rule. A review of the decided cases discloses no decision discharging a defendant because of "outrageous police conduct" where the scheme to commit the criminal act originated with the defendant. In the instant case, the Commonwealth offered to show that the scheme to manufacture illegal drugs had originated with the defendants, but the trial court sustained a defense objection and refused to permit such evidence. Thus, as the majority concedes, the evidence in this case does not establish that the idea of manufacturing illegal drugs originated with the police.[1]

I would not adopt the "outrageous police conduct" defense in this case. The record does not support the application of such a defense as a matter of law. I would conclude, as did the United States Supreme Court in *United States v. Russell*, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973), that although "we may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial pro-

---

1. It may well be that it was the absence of evidence that the illegal scheme had originated with the police which caused the jury to reject the defense of entrapment.

cesses to obtain a conviction," this case is not one of them. *Id.* at 431–432, 93 S.Ct. at 1643, 36 L.Ed.2d at 373.

This case is more appropriately one that should be governed by principles of entrapment. The law of entrapment, if properly applied, is clearly adequate to prevent an unjust conviction if Mathews and Zerr were induced to commit an illegal act by outrageous police conduct. The defense of entrapment is defined and has been made a part of the criminal law in this Commonwealth by the Crimes Code at 18 Pa.C.S. § 313. This section provides as follows:

(a) **General rule.**—A public law enforcement official or a person acting in cooperation with such an official perpetrates an entrapment if for the purpose of obtaining evidence of the commission of an offense, he induces or encourages another person to engage in conduct constituting such offense by either:

(1) making knowingly false representations designed to induce the belief that such conduct is not prohibited; or

(2) employing methods of persuasion or inducement which create a substantial risk that such an offense will be committed by persons other than those who are ready to commit it.

(b) **Burden of proof.**—Except as provided in subsection (c) of this section, a person prosecuted for an offense shall be acquitted if he proves by a preponderance of evidence that his conduct occurred in response to an entrapment.

(c) **Exception.**—The defense afforded by this section is unavailable when causing or threatening bodily injury is an element of the offense charged and the prosecution is based on conduct causing or threatening such injury to a person other than the person perpetrating the entrapment.

The statute provides for an objective test. It " 'shifts attention from the record and predisposition of the particular defendants to the conduct of the police and the likelihood, objectively considered, that it would entrap only those ready and willing to commit crime....' To determine

whether an entrapment has been perpetrated in any particular case, therefore, the inquiry will focus on the conduct of the police. . . ." *Commonwealth v. Jones,* 242 Pa.Super. 303, 311, 363 A.2d 1281, 1285 (1976), quoting the concurring opinion of Mr. Justice Frankfurter in *Sherman v. United States,* 356 U.S. 369, 384, 78 S.Ct. 819, 826, 2 L.Ed.2d 848, 857 (1958). "The defense allows an otherwise guilty defendant to go unpunished because our legislature has determined that seriously objectionable police conduct may not be tolerated." *Id.,* 242 Pa.Super. at 314, 363 A.2d at 1286. See also: *Commonwealth v. Taylor,* 299 Pa.Super. 113, 445 A.2d 174 (1982).

The evidence of objectionable police conduct in this case was submitted to the jury with instructions from the court on the defense of entrapment. The burden of proving entrapment by a preponderance of the evidence, of course, was on the defendants. 18 Pa.C.S. § 313(b). The jury found that the defense of entrapment had not been established. It found that the conduct of the police was not so outrageous under the circumstances that the defendant-appellees should go free. Therefore, the jury found defendants guilty of an attempt to manufacture a controlled substance. The trial court, in response to posttrial motions, set aside the jury's finding that police conduct had not been sufficiently objectionable to constitute an entrapment, arrested judgment and discharged the defendants. In my judgment, this was error. In setting aside the conviction and discharging the defendant, the trial court violated a most fundamental principle of law. It failed to examine the testimony in the light most favorable to the Commonwealth, which had won the verdict. See: *Commonwealth v. Derr,* 501 Pa. 446, 449, 462 A.2d 208, 210 (1983); *Commonwealth v. Sudler,* 496 Pa. 295, 302, 436 A.2d 1376, 1379 (1981); *Commonwealth v. Miller,* 327 Pa.Super. 154, 156–157, 475 A.2d 145, 146 (1984); *Commonwealth v. Portalatin,* 223 Pa.Super. 33, 36, 297 A.2d 144, 146 (1972).

If the trial court determined that the verdict was contrary to the weight of the evidence, the proper relief was to grant

a new trial. In this case, a new trial may well have been appropriate. Even though the trial court excluded evidence —erroneously, in my opinion—that the origin of the scheme to manufacture a controlled substance had originated with the defendants, there was testimony that police had supplied money to rent the home in which the defendants set up their "laboratory." Police had also furnished money for and had assisted in obtaining chemicals necessary to the manufacturing process. Police testified also that they had assisted the defendants by providing instructions when the defendants were unable to complete the manufacture of a controlled substance. Because the trial court determined to arrest judgment and discharge the defendants, however, it did not consider the defendants' motions for a new trial.

In my judgment it was error to arrest judgment and discharge defendants on the record in this case, particularly in view of the fact that the burden of proving entrapment was on the defendants. Therefore, I would reverse and remand to the trial court to consider the defendants' motions for new trial. If the trial court concludes that the weight of the testimony showed police misconduct amounting to entrapment, then it can award a new trial so that right and justice may have another opportunity to prevail. Because an arrest of judgment was improper, however, I respectfully dissent.